## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VERTIS HOLDINGS, INC., et al. | ) | Case No. 12-12821 (CSS) |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |
| _____ | ) | |
| RIVERSIDE ACQUISITION GROUP | ) | |
| LLC d/b/a COM-PAK SERVICES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 12-51176(CSS) |
| | ) | |
| VERTIS HOLDINGS, INC., VERTIS, | ) | |
| INC., 5 DIGIT PLUS, LLC, and, QUAD/ | ) | |
| GRAPHICS MARKETING, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>OPINION</u>

**HILLER & ARBAN, LLC**

Adam Hiller
Brian Arban
Johnna Darby
1500 North French Street, 2nd Floor
Wilmington, DE 19801

-and-

Gary N. Elkind
Elkind & DiMento, P.A.
2090 East Route 70
Cherry Hill, NJ 08003

-and-

**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins
Jason M. Madron
One Rodney Square
920 North King Street
Wilmington, DE 19801

-and-

Israel Dahan
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10282

-and-

Anthony Meola
The Law Offices of Anthony L. Meola
2500 Westchester Avenue
Suite 210
Purchase, NY  10577

William E. Corum
Aaron J. Mann
John J. Curciani
Husch Blackwell, LLP
4801 Main Street, Suite 1000
Kansas City, MO  64112

Counsel to Riverside Acquisition
Group LLC d/b/a Com-Pak Services

Counsel to Debtors/Defendants Vertis
Holdings, Inc., Inc.; Vertis, Inc.; and 5
Digit Plus, LLC

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
M. Blake Cleary
Michael S. Neiburg
Rodney Square
1000 North King Street
Wilmington, DE  19801

-and-

ARNOLD & PORTER LLP
Michael J. Canning
Stuart D. Aaron
Kevin T. Sullivan
399 Park Avenue
New York, NY  10022

Counsel to Defendant Quad/
Graphics Marketing, LLC

Dated:   September 11, 2015

Sontchi, J. _____

# **INTRODUCTION**

Before the Court are two related motions.  First, plaintiff filed a motion to amend

the complaint to allow the assertion of 11 additional counts.  Plaintiff's request to amend

would substantially prejudice defendants, has occurred after undue delay and is a result of bad faith.  Moreover, allowing plaintiff to amend the complaint would be futile as none of the additional counts satisfy the plausibility test under Bankruptcy Rule 7012(b)(6).  Thus, the Court will deny the motion to amend.

Second, defendants filed two separate motions seeking summary judgment on the existing six counts of the complaint.  As there are no genuine issues of material fact and defendants are entitled to judgment in their favor as a matter of law on all counts of the complaint, the Court will grant the motions and enter summary judgment in favor of defendants.

## STATEMENT OF FACTS

There are a number of important terms and a roster of persons that must be identified to understand the issues before the Court.

## I.   Important Terms

**Pitney Bowes' Group 1 Software:** Pitney Bowes' Group 1 Software, such as, MailStream Plus, in most basic terms, "analyzes lists of many names and addresses to produce an optimized plan for mailing to achieve the best postage discount."[1]  Pitney Bowes licenses Group 1 Software to its customers,[2] including RAG.[3]  5 Digit[4] and Com-Pak also licensed

---

[1] *Declaration of Kevin T. Sullivan in Support of Defendant Quad/Graphics Marketing LLC's Motion for Summary Judgment on All Counts* (Adv. D.I. 237) ("Sullivan Decl.") at Exh. X (Deposition of David Glowny, Dec. 10, 2013, 24:9-24, 25:15-21, 25:19-26:6) ("Glowny Depo.").

[2] Sullivan Decl. at Exh. X (Glowny Depo.) at 26:3-6.

[3] Sullivan Decl. at Exh. D (Deposition of Robert McDonald, Oct. 3, 2013, 101:2-13, 130:23-131:7) ("McDonald Depo.").

[4] Sullivan Decl. at Exh. Z (Deposition of Patricia Pizzutillo, Feb. 11, 2014, 331:3-7) (Pizzutillo, Feb. 11, 2014 Depo."). Ms. Pizzutillo states that 5 Digit "bought" the Group One software.  However, I think she meant

this product from Pitney Bowes.[5]  Quad also licensed Group 1 Software prior to the

purchase of Debtors' assets.[6]  After it acquired the assets, it did not renew 5 Digit's license;

it instead continued with its original license.[7]

Pitney Bowes' Engineer, David Glowny testified:

> Keeping in mind that I am neither a lawyer nor a sales person involved in
> actual contracts, my general understanding is that as a universal rule Pitney
> Bowes retaines ownership of the software that we develop.  And therefore
> when we enable a customer to use it, we license it to them for their use on
> a non exclusive basis.[8]

**Single Pass Commingling or One Pass Commingling**: A process under which a piece of

mail has to run through the sorter only once (compared to a "Dual Pass or Two Pass

System").[9]

**Pitney Bowes Modified Two Pass Sortation or Modified Two Pass System:** This is

Pitney Bowes mechanism for providing "Single Pass Commingling."[10]

---

that 5 Digit licensed the software.  Pursuant to Pitney Bowes, it does license its products to the customers.
*See* Sullivan Decl. at Exh. X (Glowny Depo.) at 26:3-6.

[5]  Sullivan Decl. Exh. CC (Deposition of Particia Pizzutillo, Jan. 31, 2014, 73:17-25) ("Pizzutillo, Jan. 31, 2014 Depo.").

[6]  Sullivan Decl. Exh. BB (Deposition of Carlos Arias, testifying on behalf of Quad pursuant to Fed. R. Civ. P. 30(b)(6), Apr. 28, 2014, 116:12-117:10, 145:10-24) ("Arias Depo.").

[7]  Sullivan Decl. Exh. BB (Arias Depo.) at 116:12-117:10, 145:10-24; Sullivan Decl. Ex. L (Deposition of Donald S. Terkel, Feb. 4, 2014, 137:2-8) ("Terkel Depo"); Sullivan Decl. Ex. CC (Pizzutillo, Jan. 31, 2014, Depo.) at 73:17-25.

[8]  Sullivan Decl. at Exh. X (Glowny Depo.) at 19:16.

[9]  Sullivan Decl. at Exh. X (Glowny Depo.) at 50:7-18.

[10]  Sullivan Decl. at Exh. X (Glowny Depo.) at 51:7-11; Sullivan Decl. at Exh. Z (Pizzutillo Feb. 11, 2014 Depo.) at 306:10-14.

**Pitney Bowes Custom Software (Modules):**  The Pitney Bowes Custom Software is also referred to as "Pdr-Driven sortation," "Pdr-Driven software," and "the 16 modules."[11] Pitney Bowes licenses these products to multiple entities, including 5- Digit[12] and Quad.[13] Com-Pak licensed at least 15 out of the 16 modules prior to RAG's acquisition of the assets.[14]

**Pitney Bowes Software Patches:** These patches, created and issued by Pitney Bowes, serve to "correct [software] logic . . . including fixing a bug or defect or perhaps . . . [to] enhance[e] its functionality."[15]  In some cases, the patches constitute an "addition to," or "modification" or "enhancement" of the software.[16]  They can even constitute a minor "customization" of a software packet.[17] Mr. Glowny, a Pitney Bowes software engineer, wrote the codes for the software patches.[18]  The patches were created in connection with the Pitney Bowes Custom Software described above.[19]

---

[11]  Sullivan Decl. at Exh. X (Glowny Depo.) at 60:9-60:25, 28:22-29:11, 54:25-55:16.

[12]  Sullivan Decl. at Exh. X (Glowny Depo.) at 39:9-17, 46:10-47:7); Sullivan Decl. Ex. CC (Pizzutillo, Jan. 31, 2014, Depo.) at 39:15-40:1; Sullivan Decl. Exh. I (Deposition of Donald Ray Clemmer, Jr., Oct. 8. 2013, 62:3-17) ("Clemmer Depo.); *Debtor/Defendants' Suggestions in Support of Their Motion for Summary Judgment on All Counts* (Adv. D.I. 224) ("Debtor/Defendants' Memorandum in Support of Summary Judgment") Exh. 19 (Pintey Bowes Sales & Maintenance Agreement and Master License Agreement); Exh. 20 (Declaration of Donald Ray Clemmer) ¶ 9.

[13]  Sullivan Decl. Exh. CC (Pizzutillo, Jan. 31, 2014, Depo.) at 73:19-25; Sullivan Decl. Exh. BB (Arias Depo.) at 116:12-117:17, 124:14-125:3; Sullivan Decl. Exh. JJ (Arias Dep. Ex. CA-4); Sullivan Decl. Exh. KK (Arias Dep. Ex. CA-5) at 4.

[14]  Sullivan Decl. at Exh. X (Glowny Depo.) at 46:10-47:4.

[15]  Sullivan Decl. at Exh. X (Glowny Depo.) at 56:1-19, 57:4-60:5.

[16]  Sullivan Decl. at Exh. X (Glowny Depo.) at 59:10-60:5.

[17]  Sullivan Decl. at Exh. X (Glowny Depo.) at 60:2-5.

[18]  Sullivan Decl. at Exh. X (Glowny Depo.) at 60:6-61:3).

[19]  Sullivan Decl. at Exh. X (Glowny Depo.) 56:20-22, 58:17-25.

**Programming Scripts ("Charlie's Programs"):**  Charlie Saccarelli wrote the scripts, which were used by Com-Pak and later by RAG.[20]  Pursuant to Mr. Saccarelli, the scripts were not used by 5 Digit.[21] They are sometimes referred to as "Charlie's Programs," "patches" (not to be confused with "Pitney Bowes Software Patches" described above), "shortcuts," "macros," "scripts," and "programming scripts."[22]  They were written in the Visual Basic programming language.  The scripts only interacted with the Pitney Bowes Custom Software Modules in a "limited sense," such as "orchestrating the order in which the modules might be invoked, for example, or stipulating the input files that were being supplied to those modules, but not otherwise delving inwards into the internal operation of the modules."[23]  Pursuant to Mr. Saccarelli, the programs did not alter the Pitney Bowes software in any way.[24]

Mr. Glowny, the Pitney Bowes software engineer, explained the differences between the Pitney Bowes Software Patches for Pitney Bowes Custom Software and the Programming Scripts as follows:

> There have been programming scripts written to surround or interact with these modules at both Com-Pak and 5 Digit Plus but I would use the word interact sparingly here.  Keep in mind that 16 modules are precompiled software for which the source code is not provided to the customer.

---

[20]  Sullivan Decl. at Exh. MM (Deposition of Charles Saccarelli, Dec. 18, 2013, 15:4-22, 20:19-24, 52:21-54:23, 95:4-96:2; RAG Depo. at 143:9-25) ("Saccarelli Depo").

[21]  Sullivan Decl. at Exh. MM ("Saccarelli Depo") at 96:3-11.

[22]  Sullivan Decl. at Exh. D (Deposition of Robert McDonald, Oct. 3, 2013, 143:9-25; 230:5-13); Sullivan Decl. at Exh. MM (Deposition of Charles Saccarelli, Dec. 18, 2013, 15:4-22, 60:5-8, 87:23-88:2, 90:2-9, 218:19-24; Sullivan Decl. at Exh. X (Deposition of David Glowny, Dec. 10, 2013, 61:4-25, 66:7-25, 68:8-15).

[23]  Sullivan Decl. at Exh. X (Glowny Depo.) at 66:7-25; Sullivan Decl. at Exh. MM (Saccarelli Depo.) at 86:17-88:2, 99:2-101:2, 222:18-225:14).

[24]  Sullivan Decl. at Exh. MM (Saccarelli Depo.) at 86:17-88:2, 99:2-101:2, 222:18-225:14.

Therefore, the actual modules themselves are not readily capable of being altered [by the customer.][25]

Mr. Saccarelli himself testified that it would be easy to create alternatives to the Charlie's Programs as they are "not very sophisticated."[26]  He stated that "[t]here's 1 million different ways" to accomplish the same.[27]  Charlie's Programs, although received by 5 Digit, were not used by 5 Digit.[28]  Quad did not receive Charlie's Programs as a result of its purchase of all of Debtors assets.[29]

**5 Digit Programs created by Larry Zimmerman:**  Mr. Zimmermann created programs that allowed 5 Digit "to manage mail job pools and job schedules and automate the intake and processing of client data files for mail jobs."[30]  Unlike Charlie's Programs, which are desktop programs that require manual operation, the Zimmerman programs were web-based platforms written in the PHP hypertext programming language. [31]

**Mixed Mail Software:**  This term appears in RAG's complaint.  RAG alleges, "that Patricia Pizzutillo . . . worked with the third-party vendor to develop the proprietary

---

[25] Sullivan Decl. at Exh. X (Glowny Depo.) at 61:18-25.

[26] Sullivan Decl. at Exh. MM (Saccarelli Depo.) at 96:20-97:12.

[27] Sullivan Decl. at Exh. MM (Saccarelli Depo.) at 90:6-17.

[28] Sullivan Decl. at Exh. NN (Deposition of Larry Zimmerman, Jan. 7, 2014, 79:22-80:22, 86:9-22, 89:2-12, 90:4-15, 104:15-17, 121:24-122:16, 123:20-124:13, 125:16-126:3, 127:6-16, 131:2-10) ("Zimmerman Depo").

[29] Sullivan Decl. Exh. BB (Arias Depo.) at 102:4-20, 103:22-107:24, 169:15-171:4, 188:23-189:19, 191:13-192:14, 224:19-227:4); Sullivan Decl. Exh. LL [Arias Depo. Ex. CA-4]; Sullivan Decl. Ex. KK [Arias Dep. Ex. CA-5] at 6-7.

[30] *Memorandum of Law in Support of Defendant Quad/Graphics Marketing, LLC's Motion for Summary Judgment Motion* (Adv. D.I. 236) ("Quad's Memorandum in Support of Summary Judgment") at 32 (citing Sullivan Decl. at Exh. NN (Zimmerman Depo.) at 50:24-53:24); Sullivan Decl. Ex. BB (Arias Depo.) at 102:4-20, 103:22-107:24, 148:20-149:20, 152:23-155:10); Sullivan Decl. Ex. KK (Arias Depo. Ex. CA-5) at 5-7.

[31] Sullivan Decl. at Exh. NN (Zimmerman Depo.) at 53:12-19, 87:11-89:2, 90:4-91:20; Sullivan Decl. at Exh. MM (Saccarelli Depo.) at 108:14-109:2; Sullivan Decl. Ex. BB (Arias Depo.) at 218:21-221:13.

software to qualify mixed mail into a single pool . . . ."[32]   However, RAG was neither able

to define the term nor name the third-party vendor.[33]   Pitney Bowes' engineer testified

that he develops, along with a colleague, "software that combines mixed mail into a single

pool."[34]   Thus, "Mixed Mail Software" refers to the "Pitney Bowes Modified Two Pass

Solution," that enables "single pass commingling" described above.

**Monticello Software:**  Commercially available, third party software, that "reads mail.dat

files and performs data processing functions."[35]   Com-Pak, as well as Monitcello coders[36]

were involved in the development of patches for Monitcello software and modifications

to Monticello's software.[37]   Com-Pak licensed Monticello software for its use.[38]   RAG[39]

and 5-Digit[40] also licensed it for their use.

**Heavy Mail Program:**  "Heavy Mail refers to standard letters greater than 3.3 ounces and

up to 3.5 ounces which when submitted to the post office incur additional postage charges

---

[32] Verified Complaint (Adv. D.I. 1) ("Complaint") at ¶25.

[33] Sullivan Decl. at Exh. D (McDonald Depo.) at 67:2-71:9, 129:5-130:2.

[34] Sullivan Decl. at Exh. X (Glowny Depo.), at 16:21-17:1, 36:1-3, 87:14-16, 147:8-13, 240:2-241:21.

[35] Sullivan Decl. at Exh. X (Glowny Depo.) at 209:2-7; Sullivan Decl. at Exh. S (Deposition of Thomas H. McCaully, Sept. 26, 2013, 19:8-12) ("McCaully Depo.").

[36] Sullivan Decl. at Exh. S (McCaully Depo.) at 140:12-141:4.

[37] Sullivan Decl. at Exh. S (McCaully Depo.) at 140:17-23.

[38] Sullivan Decl. at Exh. S (McCaully Depo.) at 145:17-146:17.

[39] Sullivan Decl. at Exh. D (McDonald Depo.) at 101:2-13.

[40] Sullivan Decl. at Exh. CC (Pizzutillo, Jan. 1, 2014 Depo.) at 39:15-40:24; Sullivan Decl. Ex. II (Monticello Software Perpetual License Agreement for Computer Software Products).

above and beyond the ordinary standard mailer charges."[41]  Only businesses authorized to commingle heavy mail, can engage in this type of business.[42]

**Lettershop:** A business that "assembles materials into finished pieces of mail for large volume mailings and certifies them to the U.S. Postal Service."  Some lettershops also offer commingling services.

**Mail Commingling:**  A "process whereby a mailer can combine mail pieces on behalf of several different other businesses to create a consolidated mailing with the hope of yielding better postage savings in the combined mailing rather than several individual mailings."[43]

## II.    The Players

**Com-Pak Services, Inc. ("Com-Pak")** - Com-Pak was a lettershop that also offered commingling services.[44]  Com-Pak faced financial difficulties and surrendered its assets to Plaintiff on November 16, 2011.[45]

**Riverside Acquisition Group LLC ("RAG" or "Plaintiff")** - RAG was formed specifically for the purpose of acquiring Com-Pak's assets.[46]  It did not own any assets prior to November 16, 2011, the date it acquired the assets.[47]  It was **not** a successor to

---

[41]  Sullivan Decl. at Exh. X (Glowny Depo.) at 234:7-21; Sullivan Decl. at Exh. Z (Pizzutillo, Feb. 11, 2014, Depo.) at 390:1-391:4.

[42]  Sullivan Decl. at Exh. Z (Pizzutillo, Feb. 11, 2014, Depo.) at 390:1-391:4.

[43]  Sullivan Decl. at Exh. X (Glowny Depo., Dec. 10, 2013, 20-21:21-26.

[44]  Sullivan Decl. at Exh. R (McCaully, Sept. 27, 2013, Depo.) at 25: 12-16.

[45]  Sullivan Decl. at Exh. D (McDonald Depo.) at 26:19-25.

[46]  Sullivan Decl. at Exh. D (McDonald Depo.) at 25:4-27:3.

[47]  Sullivan Decl. at Exh. D (McDonald Depo.) at 25:12-15.

Com-Pak.[48]  RAG paid Com-Pak $0.00 for the assets.[49]  RAG offers lettershop and mail

commingling services.  RAG's managers are Robert McDonald and Scott Mangan.

**Debtor/Defendants Vertis Holdings, Inc., Vertis, Inc. and 5 Digit Plus, LLC** - Vertis,

Inc., a wholly owned subsidiary of Vertis Holdings, Inc., was one of the largest printing

and direct marketing companies in the US.  Vertis Holdings, Inc., through a subsidiary,

jointly owned 5 Digit along with Clemmer, its founder and CEO.[50]   5 Digit offered

commingling services only.[51]

**Defendant Quad/Graphics Marketing, LLC ("Quad" and together with**

**Debtor/Defendants "Defendants")** – Quad, a global provider of print and media

solutions as well as logistics services, purchased substantially all of the assets of Vertis

and its subsidiaries, including the assets of 5 Digit, through a Section 363 asset sale.  The

Court approved the sale on December 6, 2012.[52]  The sale closed on January 16, 2013.

Quad, among other things, offers commingling services.[53]

**Pitney Bowes:**  Pitney Bowes is a manufacturer of mail sorting equipment.[54]  Com-Pak

owned and operated, and RAG now owns and operates, two Pitney Bowes Olympus II

mail sorters.   5 Digit separately purchased and operated Pitney Bowes sorters, but

---

[48]  Sullivan Decl. at Exh. D (McDonald Depo.) at 26:4-27:3.

[49]  For details regarding this transaction, *see* Sullivan Decl. at Exh. D (McDonald Depo.) at 26:14-38:7.

[50]  Sullivan Decl. at Exh. I (Clemmer Depo.) at 61:1-15.

[51]  Sullivan Decl. at Exh. I (Clemmer Depo.) at 247:20-24; Sullivan Decl. Ex. J (Certification of Defendant
Donald Ray Clemmer, Jr., Ex. 47) ¶¶ 11, 16.

[52]  Sullivan Decl. Ex. G [Asset Purchase Agreeement].

[53]  Sullivan Decl. at Exh. L (Terkel Depo.) at 33:10-35:21.

[54]  Sullivan Decl. at Exh. X (Glowny Depo.) at 21:18-22:23:5.

different models.  Quad, as a result of the purchase of substantially all of the Debtors' assets, operates the Pitney Bowes sorters 5 Digit previously operated.[55]

Pitney Bowes also develops mail sorting and processing software (explained above), which it licenses to customers on nonexclusive bases and for which it retains ownership.[56]

**The following Individuals were employed at Com-Pak, RAG and 5 Digit (the "Former Employees")**

*Patricia Pizzutillo* was the Mail Processing Manager at Com-Pak.  She was subsequently employed with RAG, 5 Digit, and Quad.[57]

*Mark Beato*:  Production Manager at Com-Pak.  He was then employed at RAG and 5 Digit.  He later joined Clemmer's new company, Firebird Presort.

*Vincent Acerbo*: Chief Operating Officer at Com-Pak.  He was later employed at RAG and 5 Digit.  He later joined Firebird Presort, Clemmer's new company.

*Linda H. Oh*: Client Service Manager at Com-Pak. She was later employed at RAG and then at 5 Digit.  She then joined Firebird Presort, Clemmer's new company.

*Edward Guyon* was Head of Information Technology and Facilities Manager at Com-Pak. He was then employed at RAG, 5 Digit, and later at Quad.[58]

---

[55]  Sullivan Decl. at Exh. Y (Deposition of Lisa A. Wurman, Nov. 14, 2013, 126:14-127:17) ("Wurman Depo.").

[56]  Sullivan Decl. at Exh. X (Glowny Depo.) at 16:24-20:19, 21:18-22:15.

[57]  *Declaration of Anthony L. Meola In Support of Riverside Acquisition Group LLC d/b/a Com-Pak Services, Inc.'s Memorandum of Law in Opposition to Debtor Defendants Vertis Holdings, Inc.'s, Vertis, Inc.'s, and 5 Digit Plus, LLC's and Defendant Quad/Graphics Marketing, LLC's Motions for Summary Judgment on All Counts* (Adv. D.I. 251) ("Meola Decl.") Ex. B (Deposition of Patricia Pizzutillo, Jan. 31, 2014, 13:7-25:6).

[58]  Meola Decl. Ex. E (Certification of Edward Guyon) at ¶¶ 2, 3, 28, 29.

**The following individuals worked at Com-Pak, but not at RAG**

*Donald Ray Clemmer:*  He was the Senior Vice President of Operations at Com-Pak.  He formed 5 Digit in December of 2011. He was CEO and part owner of 5 Digit. Today, Clemmer is the owner of Firebird Presort, a new commingling company.

*Tom McCaully:*  He was the CEO of Com-Pak.  He never worked for RAG or 5 Digit.

*Charlie Saccarelli*:  He worked for Com-Pak until September 2011 when he was laid off. He then provided consulting services to Com-Pak.  He also provided consulting services to RAG until February 2013.[59]  He was never a RAG employee.[60]  Mr. Saccarelli was the author of the "Charlie's Programs" explained above.

**Other Individuals**

*Robert McDonald* – CEO of RAG

*Larry Zimmerman*: He is a former employee of 5 Digit.  Although he never worked at Com-Pak, he provided consulting services to it.  Mr. Zimmerman was the author of the "Zimmerman Programs" for 5 Digit explained above.[61]

*David Glowny*:  Principal Engineer at Pitney Bowes.  He develops Pitney Bowes software for mail processing.[62]

*Lisa Wurman*:  Ms. Wurman was employed with Vertis and later with Quad.

*Donald Terkel:* is a Quad employee.

---

[59]  Sullivan Decl. at Exh. MM (Saccarelli Depo.) at 12:12-16, 17:5-21, 18:23-20:18, 98:13-99:1.

[60]  Sullivan Decl. at Exh. MM (Saccarelli Depo.) at 18:12-22.

[61]  Sullivan Decl. at Exh. NN (Zimmerman Depo.) at 50:24-53:24.

[62]  Quad's Memorandum in Support of Summary Judgment at 19.

*Carlos Arias*: is a Quad employee.

## III.    Procedural History

On March 15, 2012, RAG filed suit in New Jersey state court against 5 Digit, and some of the above mentioned individuals, including, Clemmer, Acerbo, Beato, Oh and Pizzutillo (the "State Action") essentially alleging that they utilized Confidential Information, Trade Secrets and Intellectual Property of RAG.    Upon Vertis, Inc.'s bankruptcy, 5 Digit was dismissed from the State Action

In October 2012, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Simultaneously with the filing of the petitions, the Debtors filed a motion seeking an order authorizing and approving the sale of substantially all of Debtors' assets to Quad.[63]  RAG objected to the sale.[64]  On December 6, 2012, the Court approved the sale.[65]

On December 5, 2012, the day before the sale hearing, RAG initiated this adversary proceeding against Debtor/Defendants and Quad alleging the following causes of action: (1) Declaratory Judgment (Count I), (2) Conversion (Count II), (3) Common Law Aiding and Abetting of Conversion (Count III), (4) Replevin (Count IV), (5) Unjust Enrichment (Count V), and (6) Accounting (Count VI).[66]

---

[63] D.I. 16, 76.

[64] D.I. 412.

[65] D.I. 425.

[66] Adv. D.I. 1.

The Court entered a Scheduling Order and fact discovery was set to close on September 2, 2013.[67]  RAG received multiple extensions of the discovery deadline.[68]  On February 10, 2014, fact discovery, with the exception of further testimony from Quad's 30(b)(6) witness, closed.  On June 18, 2014, the Court ruled that discovery was closed in full.[69]

On June 17, 2014, Debtors/Defendants filed their motion for summary judgment.[70]  On June 26, 2014, Quad as well moved for summary judgment.[71]  On July 16, 2014, RAG filed an opposition to both summary judgment motions.[72]  Three days later, on July 19, 2014, RAG filed its motion for leave to amend its adversary complaint seeking to add eleven *new* counts (the "Motion to Amend").[73]  On July 30, 2014, Defendants replied to RAG's opposition to the summary judgment motions.[74]  Defendants also responded to the Motion to Amend to which RAG replied.[75]  Thus, both motions are fully briefed and ripe for decision.

---

[67]  D.I. 25.

[68]  Adv. D.I.s 78, 138, 163

[69]  Adv. D.I. 230.

[70]  Adv. D.I. 223, 224.

[71]  Adv. D.I. 235, 236.

[72]  Adv. D.I. 258.

[73]  Adv. D.I. 252.

[74]  Adv. D.I. 254, 258.

[75]  Adv. D.I. 272, 273, 278, 280.

## IV.    Factual History

Com-Pak opened for business in January of 2000 as a lettershop.  It later added commingling services.[76]  Com-Pak licensed various software products in connection with its mail commingling services, including Monitcello Software and Pitney Bowes' Custom Software.[77]  In January of 2011, Com-Pak faced financial difficulties. These difficulties eventually led to the surrender of its assets to RAG in December of 2011 "in exchange for a cash purchase price applied at closing directly in satisfaction of certain debt obligations owed by both Tom McCaulley and Com-Pak to various creditors . . . ."[78]  Before RAG acquired the assets, however, Tom McCaully and several of his employees including, Clemmer, Acerbo and Pizzutillo discussed the possibility of setting up a standalone mail commingling business.[79]  McCaully testified that he considered selling Com-Pak's commingling portion of his business to a group including Clemmer.[80]  Tom McCaulley even testified that he would consider selling to 5 Digit once it began operating.[81]  This

---

[76] *Debtor/Defendants' Suggestions in Support of Their Motion for Summary Judgment on All Counts* ("Debtor/Defendants' Memorandum in Support of Summary Judgment") Ex. 10 (McCaully Depo.) at 24:8-25:10.

[77] Debtor/Defendants' Memorandum in Support of Summary Judgment Ex. 13 (Saccarelli Depo.) at 77:16-78:9, Ex. 14 (Deposition of Edward Guyon, Jan. 8, 2014, 130:8-11) ("Guyon Depo.").

[78] Debtor/Defendants' Memorandum in Support of Summary Judgment Ex. 10 (McCaully Sept. 26, 2013 Depo.) at 57:4-8, 117:12-19, 118:6-24.

[79] Debtor/Defendants' Memorandum in Support of Summary Judgment Ex. 10 (McCaully Sept. 26, 2013 Depo.) at 76:7-13, 77:15-78:5.

[80] Debtor/Defendants' Memorandum in Support of Summary Judgment Ex. 10 (McCaully Sept. 26, 2013 Depo.) at 85:24-86:6.

[81] Debtor/Defendants' Memorandum in Support of Summary Judgment Ex. 10 (McCaully Sept. 26, 2013 Depo.) at 88:16-21.

was no secret to RAG's McDonald prior to acquiring Com-Pak's assets.[82]  For a variety of

reasons McCaulley was not able to sell the commingling portion of his business to 5 Digit.

Instead, in November of 2011, Com-Pak surrendered its assets to RAG.  RAG did not have

any assets prior to the closing of the asset sale.[83]  RAG had no intention to continue as

Com-Pak Services, Inc.[84]  In addition, RAG's managers, including McDonald, admitted

that they did not have any experience in the mail commingling and lettershop industry.[85]

In December of 2011, Clemmer formed 5 Digit.  5 Digit only offered commingling

services.[86]  5 Digit purchased Pitney Bowes equipment and licensed software from Pitney

Bowes[87] as well as from Monticello.[88]

Clemmer and McCaulley kept in touch after Clemmer's departure from Com-Pak

in July of 2011.  McCaulley, on more than one occasion, offered Clemmer advice and help

in establishing 5 Digit.[89]  For example, in an email on July 30, 2011, Tom McCaulley wrote

to Clemmer "[c]hecking in to see if you need anything . . . [and] [l]et me know how you

---

[82]  Debtor/Defendants' Memorandum in Support of Summary Judgment Ex. 10 (McCaully Sept. 26, 2013 Depo.) at 156:11-157:13; Debtor/Defendants' Memorandum in Support of Summary Judgment Ex. 9 (McDonald Depo.) at 198:13-18.

[83]  Sullivan Decl. at Exh. D (McDonald Depo.) at 25:12-15.

[84]  Sullivan Decl. at Exh. D (McDonald Depo.) at 25:22-26:3, 26:8-18.

[85]  Debtor/Defendants' Memorandum in Support of Summary Judgment Ex. 9 (McDonald Depo.) at 284:13-18.

[86]  Sullivan Decl. at Exh. I (Clemmer Depo.) at 247:20-24; Sullivan Decl. Ex. J (Clemmer Depo. Ex. 47 (Certification of Defendant Donald Ray Clemmer)) ¶¶ 11, 16.

[87]  Debtor/Defendants' Memorandum in Support of Summary Judgment Ex. 19 (Pitney Bowes Sales and Maintenance Agreement); Ex. 21 (Clemmer Depo.) at 62:3-17; Ex. 14 (Guyon Depo.) at 139:10-140:9; 141:3-142:9.

[88]  Debtor/Defendants' Memorandum in Support of Summary Judgment Exh. 14 (Guyon Depo.) at 140:10-20.

[89]  Debtor/Defendants' Memorandum in Support of Summary Judgment Exh.  27 (copies of emails).

are moving along." [90]   Clemmer wrote in one of the emails that [p]otential future customers are coming out of the wood work . . . [t]here is a definite need for a stand alone facility."[91]  In response to yet another email from Clemmer, McCaulley wrote:

> I am there for you
> Just ask
> Best,
> Tom[92]

## A.  The Alleged Misconduct

On July 26, 2011, only a few days after Clemmer left Com-Pak, [93] and unknown to McCaulley,[94] Clemmer emailed Guyon, Oh, Beato, Pizzutillo, Acerbo and others while they were still employed at Com-Pak and subject to "Confidentiality and Non-Competition Agreements."[95]  He also emailed Saccarelli.[96] Tom McCaully was unaware of these communications and testified that he would have "terminated his employees" if he would have been aware of them.[97]

In an email, titled "The Team," Clemmer "describes all of their [prospective] jobs" at the yet-to-be-formed 5 Digit.  In subsequent emails, Clemmer requested specific

---

[90] Debtor/Defendants' Memorandum in Support of Summary Judgment Exh. 27 (copies of emails).

[91] Debtor/Defendants' Memorandum in Support of Summary Judgment Exh. 27 (copies of emails).

[92] Debtor/Defendants' Memorandum in Support of Summary Judgment Exh. Ex. 28 (additional emails).

[93] Debtor/Defendants' Memorandum in Support of Summary Judgment Exh. 21 (Clemmer Depo.) at 59:7-12).

[94] Meola Decl. Ex. N (McCaully, Sept. 27, 2013, Depo.) at 61:23-62:3.

[95] Meola Decl. Exh. N (McCaully, Sept. 27, 2013 Depo.) at 56:2-62:6.

[96] Meola Decl. Exh. C (Deposition of Donald Ray Clemmer, Jr., Oct. 8, 2013, 203:6-25); Meola Decl. Ex. N (Deposition of Thomas H. McCaully, Sept. 27, 2013, 43:15-23; 44:3-24, 45:19-25, 46:1-25, 47:1-25).

[97] Meola Decl. Exh. N (McCaully Depo., Sept. 27, 2013 Depo.) at 61:13-62:3.

information as to his commingling business.[98]    Clemmer further requested that all communications between him and the employees be kept confidential.[99]    These communications continued until after RAG acquired Com-Pak's assets.[100]

While still attending to their duties at Com-Pak and RAG, the Former Employees engaged in activities furthering Clemmer's goal of establishing a standalone commingling company.  What follows is just a short list of many examples evidencing the efforts and the commitment of the Former Employees to assist Clemmer:

- Ms. Pizzutillo admits that she, beginning in July of 2011, communicated with Clemmer about creating a new commingling company,[101] and that she discussed software and potential software requirements with him;[102]

- Mr. Clemmer testified that he communicated with Patricia Pizzutillo while she worked at RAG, about mail.dat files, and that he, as a result, received information on those files;[103]

- Mr. Clemmer testified that Mr. Acerbo, while he was presumably still employed at RAG, opened a bank account for 5 Digit,[104] and worked on financial plans for 5 Digit;[105]

---

[98]  Meola Decl. Exh. B (Pizzutillo Depo. at 136:17-137:13.

[99]  Meola Decl. Exh. B (Pizzutillo Depo. at 136:17-137:13.

[100]  Meola Decl. Exh. C (Clemmer Depo. at 219:1-227:25.

[101]  Meola Decl. Exh. B (Pizzutillo Depo.) at 44:21-45:23.

[102]  Meola Decl. Exh. B (Pizzutillo Depo.) at 176-179, 194-196).

[103]  Meola Decl. Exh. C (Clemmer Depo.) at 121:15:19.

[104]  Meola Decl. Exh. C (Clemmer Depo.)  at 122:20-24.

[105]  Meola Decl. Exh. C (Clemmer Depo.) at 156:2-22; 228:5-24, 229:1-4.

- Mr. Clemmer offered Ms. Pizzutillo a position with his new company in July 2011;[106]

- Mr. Guyon certified that he "was requested by Vincent Acerbo to advise the best type of external hard drive for him to utilize in order for him to personally transfer files, documents and software from Com-Pak Services, Inc. and Riverside Acquisition Group LLC onto. I recommended an external hard drive manufactured by Western Digital;"[107]

- Ms. Pizzutillo received a laptop from Vertis to perform certain tests for Clemmer and to create a list of programs needed;[108] including "home grown software programs developed by Com-Pak;[109]

- Ms. Pizzutillo admitted that she in fact performed those tests;[110]

- Clemmer testified that he had Vertis set up a FTP site Ms. Pizzutillo utilized for the tests for 5 Digit;[111]

- Clemmer admits that Ms. Pizzutillo responded to his email stating, "Ed supposedly has all Charlie's programs.  Probably need FTP capability also."[112]

- Ms. Pizzutillo testified that she, contrary to standard procedures at Com-Pak, emailed electronic files to her personal email account;

---

[106]  Meola Decl. Exh. B (Deposition of Patricia Pizzutillo, Jan. 31, 2014, 61:19-25).

[107]  Meola Dec, Exh. E (Certification of Edward Guyon) at ¶26.

[108]  Meola Decl. Exh. C (Deposition of Donald Ray Clemmer, Jr., Oct. 8, 2013, 129:10-15).

[109]  Meola Decl. Exh. C (Deposition of Donald Ray Clemmer, Jr., Oct. 8, 2013, 133:5-25; 134:1-21; 135:1-25, 136:1-4).

[110]  Meola Decl. Exh. B (Deposition of Patricia Pizzutillo, Jan. 31, 2014, 69:11-70:13).

[111]  Meola Decl. Ex. C (Deposition of Donald Ray Clemmer, Jr., Oct. 8, 2013, 138:3-11, 14-16).

[112]  Meola Decl. Ex. C (Deposition of Donald Ray Clemmer, Jr., Oct. 8, 2013, 136:5-8).

- On May 23, Ms. Pizzutillo sent an email to Clemmer notifying him that she is "currently sending home the SOP and QC statements" and that she should have "probably just copied [her] whole drive;" [113]

- Ms. Pizzutillo admits that Acerbo asked her to instruct Saccarelli to move his programs on the Com-Pak network, so that she could access them;[114]

- Ms. Pizzutillo testified that Clemmer regularly emailed the Former Employees with requests and tasks he needed done;[115]

- Ms. Pizzutillo admits that she "downloaded a postal card from the postal website, a permit card" for 5 Digit;[116]

- Mr. Beato testified that Clemmer sent an email in July 2011, addressing each "team members' function" at his new company;[117]

- There were email correspondences between Clemmer and Pizzutillo and others about "freight costs" and "history with RRD pricing;"

- Mr. Acerbo admitted that he obtained an EIN for 5 Digit without disclosing his assistance to Clemmer to RAG;[118]

---

[113] Meola Decl. Ex. B (Pizzutillo, Jan. 31, 2014, Depo.) at 94:8-19; *see also* at 100:18-23.

[114] Meola Decl. Ex. B (Pizzutillo, Jan. 31, 2014, Depo.) at 104:14-107:5).

[115] Meola Decl. Ex. B (Pizzutillo, Jan. 31, 2014, Depo.) at 68:17-19; *see* Meola Decl. Ex. H (Deposition of Mark Beato, Jr., Feb. 11, 2014, 177-194 for more examples about email correspondences) ("Beato Depo.").

[116] Meola Decl. Ex. B (Pizzutillo, Jan. 31, 2014, Depo.) at 364:13-365:10.

[117] Meola Decl. Ex. H (Beato Depo.) at 140:25-141:3.

[118] Meola Decl. Ex. I (Acerbo Depo.) at 31:8-15.

- Acerbo admitted that he sent home an email attaching the "Updated Commingling postage costs" document of RAG to his personal email account,[119] which he, after his termination from RAG, did not return;[120]

- RAG alleges that Mr. Guyon and others moved the proprietary software, processes and confidential information around the Com-Pak computer system to provide easy access to remove such proprietary software, processes and confidential information from Com-Pak;[121]

- Ms. Oh testified that she observed emails Mr. Acerbo sent to Clemmer disclosing non-public customer information of Com-Pak;[122]

- There is further testimony that certain financial documents on 5 Digit servers and utilized by 5 Digit were exactly the same documents that were used at RAG;[123]

- Mr. Guyon testified that certain documents, such as expense reports, on 5 Digit servers looked (in terms of layout, not content) the same as the documents Com-Pak and RAG utilized;[124]

---

[119]  Meola Decl. Ex. I (Acerbo Depo.) at 42:16-43:18.

[120]  Meola Decl. Ex. I (Acerbo Depo.) at 48:8-10.

[121]  Meola Decl. Ex. E (Certification of Edward Guyon) at ¶22.

[122]  Meola Decl. Ex. K (Deposition of Linda H. Oh, March 12, 2014, 261:5-18; 262:1-22) ("Oh Depo.).

[123]  Meola Decl. Ex. L (Guyon Depo.) at 117:7-118:1-14.

[124]  Meola Dec. Ex. L (Guyon Depo.) at 157:20-161:16; 188:13-24; 189:2-9, 190:1-7.

- Mr. Guyon also testified that certain software and information on Quad's servers is the same as on 5 Digit servers, and that all information on 5 Digit servers was migrated to Quad.[125]

Tom McCaully, testified that he had no knowledge of the alleged misconduct by Clemmer or other former employees.[126]  He further stated that he had no knowledge as to any business that went to 5 Digit, which would otherwise have gone to Com-Pak or RAG.[127]  He further testified that he had no knowledge as to whether Vertis or 5 Digit ever used any of Com-Pak's confidential information and intellectual property.[128]

With respect to its "Intellectual Property" and to who "stole" what, RAG provided the following information:

> Patricia Pizzutillo and Charlie Saccarelli personally stole RAG software, business information and intellectual property including Group One software and RAG related enhancements, RAG owned software modules compatible with Pitney Bowes mail sorting machines and related patches.
>
> Donald Clemmer transferred to Defendants business information in form of cost quotes for vantage sorters, patches to MSG data after mail stream plus software as well as RAG owned improvements and enhancements to Monticello software.
>
> Vincent Acerbo stole and transferred to Defendants sale, freight RFP and client strategy information.

---

[125] Meola Dec. Ex. L (Guyon Depo.) at 287:7-15; 294:21-296:1-4.

[126] Debtor/Defendants' Memorandum of Law in Support of Summary Judgment Ex. 10 (McCaulley Sept. 26, 2013 Depo.) at 161:2-20.

[127] Debtor/Defendants' Memorandum of Law in Support of Summary Judgment Ex. 10 (McCaulley Sept. 26, 2013 Depo.) at 161:20-24.

[128] Debtor/Defendants' Memorandum of Law in Support of Summary Judgment Ex. 11 (McCaulley Sept. 27, 2013 Depo.) at 151:17-152:3.

Lisa Wurman conspired with Clemmer and Saccarelli to receive a RAG owned mail.dat file on behalf of and for use within Vertis, such mail.dat file contains confidential and proprietary information owned by RAG.[129]

## B.  The "Intellectual Property" and "Confidential Information" at Issue

RAG asserts in its Complaint that the former employees of Com-Pak and RAG, while establishing 5 Digit with Clemmer, allegedly took RAG's "Confidential Information" and/or "Intellectual Property"[130] and also "actively solicited Plaintiff's customers on whom they called while employed by Plaintiff so that 5 Digit would have business with which to commence operations."[131]

In its Complaint, RAG defines "Intellectual Property" as including: "in-house software to convert mail commingling equipment from dual pass to single pass" and proprietary software it developed with the third-party vendor "to qualify mixed mail into single pool, which are critical to the operations of Plaintiff."[132]  RAG defines "Confidential Information" as including: "customer lists, customers' ordering habits, merchandising plans, projections, product strategies, pricing methods and mark up structures."[133]  In addition, RAG asserts that "Ms. Pizzutillo also has within her mind all of the quirks, modifications, enhancements and proposed enhancements to Plaintiff's Intellectual Property, which would almost be impossible for a competitor to duplicate . .

---

[129] Sullivan Decl. Ex. V (RAG's Supplemental Answers to Debtors' First Set of Interrogatories) No. 11.

[130] Sullivan Decl. Ex. D (McDonald Depo.), at 12:22-13:4.

[131] Complaint at ¶¶ 21-26.

[132] Complaint at ¶ 25.

[133] Complaint at ¶ 24.

. ."[134]  RAG later, in its answers to Debtors' First Set of Interrogatories, further defined

these terms.[135]

The property at issue was also addressed at several telephonic status conferences

in which RAG's counsel made the following statements to this Court:

> Our response to their interrogatories, our responses to their request for
> production, all indicate and disclose specific pieces of **software**, specific
> pieces of information that we allege were taken. So, in terms of Mr.
> Stewart's comments that we don't know what the 'items' that have been
> misappropriated are, I disagree.[136]

> **The home grown software is the key to this case** . . . . We are talking about
> **modifications in derivative works[137] to software methods and processes**
> that were owned originally by Riverside and that were taken from them
> and implemented in the 5 Digit process . . . It's the bucket that Mr. Sullivan
> described as **the home grown software, that's the special sauce in this
> case.**[138]

However, when asked at his deposition whether the copying of the computer data

would be all RAG is alleging, McDonald stated: "There may be information that didn't

specifically come from a computer or a server that's included."[139]

The nature of the property came up again later during McDonald's deposition

when he was asked about "hard copy materials."  McDonald responded when asked

---

[134]  Complaint at ¶ 25

[135]  Sullivan Decl. Ex. W (Riverside Acquisition Group LLC d/b/a/ COM-PAK Services Answers to Debtors' First Set of Interrogatories), at 3 and 4.

[136]  *Debtor/Defendants' Reply Suggestions in Support of Their Motion for Summary Judgment on all Counts* ("Debtor/Defendants' Reply") at 15 (citing Transcript of Telephonic Status Conference Before the Honorable Christopher S. Sontchi United Stated Bankruptcy Judge)(September 18, 2014) (D.I. 124) Exh. 1 at 14:23-15:4).

[137]  This is a term used in copyright law.

[138]  Meola Decl. Ex. 36 (Transcript of Telephonic Status Conference Before the Honorable Christopher S. Sontchi United Stated Bankruptcy Judge)(April 15, 2014) at 13:3-22.

[139]  Sullivan Decl. Ex. D (McDonald Depo.) at 13:16-24.

about "what hard copy materials are we talking about," that "[t]here are co-mingle presentations . . . [and] one-price matrices that were developed on Excel."[140]  McDonald continued, "[t]here were freight analysis by carrier, there were RFPs where the information was being – we were in the process of working on those RFPs. . . .[141]

> Q. And so this information that's referred to, the co-mingling presentation, the matrices, the freight analysis, you said these are hard copy documents? Are they only kept in hard copy form?

> A. No. They were done both ways.

> . . .

> Q.    I just want to make sure we're clear because I think earlier we talked about how we're talking about copies of electronic information. So I just want to make sure there was not one hard copy customer list that was kept in a vault somewhere. That's not what we are talking about, right?

> A.    Not to the best of my knowledge.

> Q.    Okay. Nothing like that – that was only kept in hard copy form – that has gone missing?

> A.    I believe that probably everything exists in soft copy somewhere.[142]

RAG further testified that its "Confidential Information" and "Intellectual Property" is still available for its use today.[143]

> Q. The intellectual property that you claim was taken, is any of that unavailable to you today to use?

> A. No

> Q. So you're actually continuing to use that intellectual property, correct?

---

[140]  Sullivan Decl. Ex. D (McDonald Depo.) at 92:23-93:2.

[141]  Sullivan Decl. Ex. D (McDonald Depo.) at 92:23-93:2.

[142]  Sullivan Decl. Ex. D (McDonald Depo.) at 93:22-94:15.

[143]  Sullivan Decl. Ex. D (McDonald Depo.) at 220:25-221:3; 220:18-24, 248:11-15.

A. That is correct.

Q. The confidential information, was any of that taken in such a way that it's not available to you to use?

A. No, it's certainly available to us.[144]

### The Motion to Amend

RAG seeks leave to amend its Complaint to include eleven additional counts (as amended, the "Amended Complaint").  It asserts that all eleven counts are based on the same facts as the previous six counts already contained in the Complaint.   RAG intends to add the following counts: (1) Violations Under the New Jersey Computer Related Offenses Act (Count VII); (2) Violations under the Computer Fraud and Abuse Act (Count VIII); (3) Violations Under the New Jersey Trade Secret Act (Count IX); (4) Trespass to Chattels (Count X); (5) Intentional Interference with Contractual Relationships (Count XI); (6) Intentional Interference with Plaintiff's Prospective Business Advantage (Count XII); (7) Unfair Competition (Count XIII); (8) Common Law Aiding and Abetting (Count XIV); (9) Civil Conspiracy (Count XV); (10) Common Law Misappropriation of Trade Secrets (Count XVI) and (11) Common Law Misappropriation of Confidential and Proprietary Information (Count XVII).

Federal Rule of Civil Procedure 15(a), made applicable to this proceeding by Fed. R. Bankr. P. 7015, provides that a court should "freely give leave [to amend a pleading] when justice so requires."[145]  The decision to grant a motion for leave to amend is within

---

[144] Sullivan Decl. Ex. D (McDonald Depo.) at 220:18-221:3.

[145] Fed.R.Civ.P. 15(a).

the "sound discretion" of the . . . court.[146] "Courts have shown a strong liberality . . . in allowing amendments."[147]

In *Foman v. Davis*, the leading Supreme Court case reflecting this liberal standard,[148] the Supreme Court held:

> In the absence of any apparent or declared reason – such as undue delay, bad faith or a dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc. – the leave sought should, as the rules require, be freely given.[149]

"Third Circuit courts have extrapolated five instances in which a court may deny leave to amend a complaint: (1) if delay in seeking amendment is undue; (2) if delay in seeking amendment is prejudicial to the opposing party; (3) if delay in seeking amendment is motivated by bad faith; (4) if the amendment is futile in that it fails to state a claim for which relief can be granted; or (5) if the movant does not provide a drafted amended complaint."[150]

---

[146] *Winer Family Trust v. Queen*, 503 F.3d 319, 331 (3d Cir. 2007); *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 518-19 (3d Cir. 1988) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

[147] *Boileau v. Bethlehem Steel Corp.*, 730 F.2d 929, 938 (3d Cir. 1984); *see also Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004) ("We have held that motions to amend pleadings should be liberally granted."); *Adams v. Gould, Inc.*, 739 F.2d 858, 864 (3d Cir. 1984) ("Fed.R.Civ.P. 15 embodies the liberal pleading philosophy of the federal rules.").

[148] *Mortgage Lenders Network USA, Inc. v. Wells Fargo Bank* (*In re Mortgage Lenders Network, USA, Inc.*), 395 B.R. 871, 876 (Bankr. D. Del. 2008).

[149] 371 U.S. 178, 182 (1962).

[150] *In re Mortgage Lenders Network, USA, Inc.*, 395 B.R. 871, 876 (citing *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 272-73 (3d Cir. 2001)).

While the existence of any one of those factors can warrant a denial of a motion to amend, courts in the Third Circuit have repeatedly stated, "prejudice to the non-moving party is the touchstone for the denial of an amendment."[151]  "In the absence of substantial or undue prejudice, denial instead must be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment."[152]

## I.    Substantial or Undue Prejudice

Defendants advance two main arguments as to why they would be unduly prejudiced if the Motion to Amend were granted.  First, Quad contends that the proposed Amended Complaint "significantly alter[s] the landscape of this litigation, forcing [it] to defend against novel theories of the case at an exceedingly late stage in the proceedings." [153]  Second, Defendants assert they "would be forced to engage in substantial additional discovery, work that could have been accomplished in connection with the extensive discovery the parties have already undertaken."[154]  Defendants are correct on both arguments and granting the Motion to Amend would result in substantial and undue prejudice to Defendants.

---

[151] *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc.*, 663 F.2d 419, 425 (3d Cir.1981).

[152] Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993) (citing *Heyl & Patterson Int'l Inc. v. F.D. Rich Housinh of the Virgin Islands, Inc.*, 663 F.2d 419, 425 (3d Cir. 1981)).

[153] *Defendant Quad/Graphics Marketing, LLC's Memorandum of Law in Opposition to Plaintiff's Motion for Leave to File First Amended Verified Complaint* ("Quad's Opposition") at 13.

[154] *Debtor/Defendants' Opposition to Plaintiff's Motion for Leave to Amend its Complaint* ("Debtor/Defendants' Opposition") at 9; Quad's Opposition at 14-16.

In considering whether prejudice exists, "[courts] have considered whether allowing an amendment would result in additional discovery, cost, and preparation to defend against new facts **or** new theories."[155]

### A.    The Proposed Counts Constitute "New Legal Theories"

Plaintiff repeatedly states that the proposed claims are "based on the same facts as the original complaint."[156]    The question is, however, whether the proposed counts constitute "new legal theories."

Quad asserts that adding the proposed claims would "significantly alter the landscape of this litigation."[157]    More specifically, Quad contends that the original Complaint alleged that Quad came into possession of RAG's "Confidential Information" and "Intellectual Property" through the sale of substantially all of Debtors' assets.[158] Quad continues, that the proposed Amended Complaint forces it "to defend against various trade secret claims as well as allegations that it has unlawfully accessed and taken RAG's computer data, conspired with the Debtors, interfered with RAG's employee and client contractual relationships . . . ."[159]    Quad asserts, that "[s]uch introduction of significantly different theories of the case, in terms of liability and damages, would

---

[155] *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001).

[156]  *Riverside Acquisition Group LLC d/b/a/ Com-Pak Services' Motion for Leave to File First Amended Verified Complaint* ("Motion to Amend") at 4 ("Riverside seeks leave to amend its Complaint to include the following additional counts based on facts previously pled in the Complaint."); *see also*, *Riverside Acquisition Group LLC d/b/a/ Com-Pak Services, Inc.'s Reply to Defendant Quad/Graphics Marketing, LLC's Memorandum of Law in Opposition to Plaintiff's Motion for Leave to File First Amended Verified Complaint* ("RAG's Reply to Quad's Opposition") at 7.

[157]  Quad's Opposition at 13.

[158]  Quad's Opposition at 13.

[159]  Quad's Opposition at 13.

substantially prejudice Quad and therefore should not be permitted at this late stage in the proceeding."[160]

Plaintiff rejects the "new theory" arguments, describing them as "exaggerated."[161] Plaintiff explains, "it is not seeking to expand the scope of its claims beyond those already known to all parties within this litigation under the present set of facts."[162]   Plaintiff further asserts that the claims are not "new" because RAG pursued some of them in the State Action and attached a copy of its State Action complaint as an exhibit to the Complaint in the instant action.[163]

In *Cornell & Co., Inc. v. Occupational Safety and Health Review Commission*, the Third Circuit Court of Appeals, in holding that "the Commission abused its discretion in allowing the Secretary of Labor . . . to amend twice," found that the amendment "changed the legal and factual matters in dispute." [164]   There, Cornell, a steel construction company, was fined for erecting a steel flare structure and a steel frame without using the required temporary flooring for a "tiered building."[165]   The Secretary later moved to add violations of certain code sections requiring safety belts.[166]   The request was granted.[167]   The Third

---

[160] *Id*. at 14.

[161] RAG's Reply to Quad's Opposition at 5.

[162] *Riverside Acquisition Group LLC d/b/a Com-Pak Services, Inc.'s Reply to Debtor/Defendants' Opposition to Plaintiff's Motion for Leave to Amend its Complaint* ("RAG's Reply to Debtor/Defendants' Opposition") at 6.

[163] *Id*.

[164] 573 F.2d 820, 824 (3rd Cir. 1978).

[165] *Id*. at 821-22.

[166] *Id*. at 822.

[167] *Id*.

Circuit Court of Appeals reversed stating that "[w]hen the Secretary moved to amend the complaint . . . months after the inspection and just before the hearing, the legal and factual matters in dispute changed drastically. . . [as] the inquiry suddenly shifted to whether that part of the structure . . . was sufficiently secure . . . to permit the workers to attach their safety belts to it."[168]

The same conclusion can be drawn in the case *sub judice*.  While RAG, in its original Complaint, primarily alleged a "taking" of its "Intellectual Property" and "Confidential Information," the proposed claims focus primarily on interference with certain contractual relationships and prospective, allegedly lost, business opportunities.  As such, the new claims constitute new legal theories "chang[ing] the legal and factual matters in dispute."

Plaintiff's argument that the newly proposed claims are not "new," because Plaintiff previously pled, and later abandoned some of them in the State Action, is misplaced.  Although the claims might not have been "new" to Defendants in a sense that they were aware that RAG pursued them before, they constitute "new legal theories" for purposes of this action.  As Defendants correctly point out, Plaintiff "defined the scope of this adversary proceeding through [its adversary] Complaint."[169]

---

[168] *Id*. at 824.

[169] Debtor/Defendants' Opposition at 10.

### B.    The Need for Additional Discovery at This Stage in the Proceedings Would Be Prejudicial to Defendants

"Courts have denied a request for leave to amend when both discovery would need to be reopened and a new trial date would need to be set, and when the opposing party would suffer 'severe, irremediable prejudice' if leave was granted."[170]

In contrast, "courts have granted leave to amend when the non-moving party would suffer no prejudice because no new facts or additional discovery was required."[171] However, even if the a non-moving party may be prejudiced, courts have granted leave to amend, "as long as the non-moving party would not be overly prejudiced."[172]  In fact, the Third Circuit previously held that "[t]he need for additional discovery does not conclusively establish prejudice."[173]

For instance, in *In re Mortgage Lenders Network, USA, Inc.*, Judge Walsh granted plaintiff's motion to amend although a trial date had already been set.[174]  There, plaintiff sought to add an unjust enrichment claim to its breach-of-contract claim based on the same facts.[175]  Similar to the case *sub judice*, the plaintiff represented it did not intend to conduct further discovery on the issue.[176]  With respect to undue prejudice, Judge Walsh held that "even if [Defendant] does need to conduct additional discovery, I do not think

---

[170] *In re Mortgage Lenders Network, USA, Inc.*, 395 B.R. at 878 (citations omitted).

[171] *Id.* (citations omitted).

[172] *Id.* (citing *Usery v. Marquette Cement Manufacturing Co.*, 568 F.2d 902 (2d Cir. 1977)).

[173] *Id.* at 879 (citing *Dole v. Arco Chemical, Co.*, 921 F.2d 484, 488 (3d Cir. 1990)).

[174] 395 B.R. 871 (Bankr. D. Del. 2008).

[175] *Id.* at 875.

[176] *Id.* at 878.

that the possibility will cause undue prejudice . . . ."[177]  The Court concluded, "the level of hardship that may be placed on [Defendant] is not high enough to justify a denial of leave to amend."[178]

In *In re Fleming Companies, Inc.*, the post-confirmation trust established under the debtors' Chapter 11 plan sought leave to amend "to modify language in its turnover of property count and to add a new claim for breach of contract in violation of the automatic stay."[179]  Defendants objected arguing that they would have asked "different and additional questions of at least eight witnesses already deposed."[180]  The Plaintiff disagreed arguing that "it would not be difficult to conduct discovery on the limited issue of additional damages . . . ."[181]  Judge Walrath, in agreeing with the plaintiff, found, "the facts and circumstances relating to the proposed amendments are closely intertwined with the allegations set forth in the original complaint . . . [and] the plaintiff is not asserting a new count with unrelated facts that would require the parties to start discovery anew."[182]

The Defendants primarily assert that the new claims would require "additional, extensive discovery, and, thus, would substantially prejudice" them.[183]  For example,

---

[177] *Id.*

[178] *Id.* at 879.

[179] 323 B.R. 144, 147 (Bankr. D. Del. 2005).

[180] *Id.* at 148.

[181] *Id.*

[182] *Id.* at 149.

[183] Quad's Opposition at 6.

Debtor/Defendants assert that the proposed count of "interference with contractual relationships" alone would require extensive discovery as to "what particular contracts [are] at issue, the terms of those contracts, what RAG alleges to have been the particular tortious activity with regard to each particular contract, and the alleged damages."[184] Defendants further argue that Pitney Bowes would likely have to be added as a new party.[185]

Plaintiff disagrees emphasizing that discovery resulted in the production of approximately 750,000 pages of documents and 18 witness depositions.[186]  Plaintiff further asserts that it is not seeking additional discovery in this case and that it cannot foresee that any other discovery would be needed.[187]

Plaintiff's position that no new discovery will be required is divorced from reality. In fact, substantial additional discovery will clearly be required to properly address the new claims and "new legal theories."  That additional discovery would rise to a "severe, [and] irremediable" level.  Thus, the Court finds the need for additional discovery establishes prejudice in this case.

---

[184] Debtor/Defendants' Opposition at 10.

[185] *Id*. at 11.

[186] *Id*. at 7.

[187] Motion to Amend at 7.

## II.    Undue Delay

> *"It was only after briefing was completed on the summary judgment motion
> . . . i.e., when the proverbial writing was on the wall – that Trans Video
> first expressed to Sony that it wanted to move to amend."*[188]

Plaintiff simply asserts "[t]here is not undue delay here. There is no trial date scheduled, and discovery just recently closed on June 16, 2014."[189] To support its argument, Plaintiff simply, without providing any factual background, cites to a few opinions in which courts have granted motions to amend after elapsed time periods ranging from eight months to two and one-half years between the filings of the original pleading and the motion for leave to amend.[190]

The Defendants argue that RAG's Motion to Amend should be denied because RAG, among other things, failed to provide "any valid reason for not amending sooner."[191] Defendants take particular issue with Plaintiff's statement that "discovery just recently closed on June 16, 2014," pointing out that the parties were not actively engaged in fact discovery until that date but, rather discovery had been substantially completed well before.[192]

---

[188] Debtor/Defendants' Opposition at 1 (citing *Trans Video Elecs., Ltd. v. Sony Elecs., Inc.*, 278 F.R.D. 505, 510 (N.D. Cal. 2011)).

[189] RAG's Motion to Amend at 5.

[190] RAG's Motion to Amend at 5-6.

[191] Debtor/Defendants' Opposition at 6.

[192] Quad's Opposition at 15.

     This Court's Second Amended Scheduling Order set the close of fact discovery for January 10, 2014. By that point, Defendants' respective document productions totaling more than 750,000 pages altogether were complete, and the parties had taken 13 fact depositions. This Court's Third Amended Scheduling Order extended fact discovery one month past January 10, to February 10, solely for the limited purpose of allowing two additional depositions per party. RAG subsequently deposed two witnesses – Patricia Pizzutillo and

The Plaintiff, in its reply, rejects Defendants' arguments, especially that it has to provide a reason for not amending sooner. RAG "disputes any interpretation of case law in this jurisdiction as holding that the lack of a reason for the delay, without more, warrants denial of a request to amend a pleading."[193]  In support of its position, RAG cites to *Cureton v. National Collegiate Athletic Ass'n*, for the proposition that, "the mere passage of time does not require that a motion to amend a complaint be denied on the grounds of delay.  In fact, delay alone is an insufficient ground to deny leave to amend."[194]

Although RAG is correct in citing *Cureton* for the proposition that delay alone is not sufficient to deny a motion to amend, Plaintiff did not read *Cureton* far enough.  The *Cureton* court continued that, "at some point, the delay will become 'undue,' placing an unfair burden on the court, or will become prejudicial, placing an unfair burden on the opposing party."[195]  The Court explained that "[d]elay may become undue when a movant has had previous opportunities to amend a complaint."[196]  The Court held, in affirming the District Court's denial of plaintiff's post-summary-judgment motion to

---

Don Terkel, a Quad corporate representative under Rule 30(b)(6) – and Defendants deposed none.  The only fact discovery that occurred in this Action beyond those two depositions was the April 28 deposition of Mr. Arias. . . . Other than Mr. Arias' deposition, fact discovery in this Action has, for all intents and purposes, been largely closed for as much as six months before the June 16, 2014 hearing and more than seven months before RAG files its Motion to Amend.

*Id.*

[193]  RAG's Reply to Quad's Opposition at 8.

[194]  RAG's Reply to Quad's Opposition at 8 (citing *Cureton v. National Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001).

[195]  *Cureton*, 252 F.3d at 273 (citation omitted).

[196]  *Id.* (citation omitted).

36

amend, that "the motion was filed three years after the complaint was filed" and "the factual information on which the proposed amendment relied was known almost two-and-a-half years before plaintiffs sought leave to amend."[197]

Other courts have reached similar conclusions.  For instance in *Lorenz v. CSX Corp.*, the Third Circuit, in affirming the District Court's denial of plaintiff's motion to amend, found undue delay mainly because "most of the facts were available to plaintiff . . . before she filed her original complaint . . . [and because plaintiff] had numerous opportunities to correct any deficiencies in her . . . claim but failed to take advantage of them."[198]

Similarly in *Panetta v. SAP*, plaintiff sought leave to amend to add two new counts, which were based on the same facts as the original complaint.  The Third Circuit, in affirming the District Court's denial of the motion, stated "we agree with the District Court that such claim was known to Panetta early on in this litigation because the cause of action arises out of the same set of facts as the breach of contract claim."[199]

Here, there has been "undue delay."  RAG was aware of many of its new claims early in this litigation.  RAG further repeatedly states that its proposed Amended Complaint is based on the same facts as its Complaint.

---

[197] *Cureton*, 252 F.3d at 273.

[198] 1 F.3d 1406, 1414 (3d Cir. 1996).

[199] 294 Fed.Appx. 715, 716 (3d Cir. 2008).

### A.    Plaintiff Must Provide a Valid Reason for Its Delay

Plaintiff asserts that it does not have to provide this Court with a reason as to why it did not seek an amendment earlier.   However, courts regularly inquire about a movants' reasons in determining whether there is undue delay.

For instance, Judge Walsh in *In re Mortgage Lenders Network, USA, Inc.*, stated "[i]n assessing whether delay in amending is undue, courts focus on the moving party's reasons for not amending sooner."[200]   There, the movant, hoping for the case to settle, filed a proposed amended complaint after the settlement fell through.[201]   Judge Walsh, finding this reason to be sufficient, held that the delay was not undue.[202]

Similarly, in *In re Fleming Companies, Inc.*, Judge Walrath declined to find undue delay in a case in which the movant offered an explanation for its delay.[203]   There, the movant argued, "the amendment is required to address contradictory positions taken by the Defendant and additional facts that came to light through discovery."[204]

In contrast, in *In re Vision Metals, Inc.*, Judge Walrath found undue delay where the movant, fourteen months after its original complaint was filed and without offering a reason for its delay, sought leave to amend.[205]   The amended complaint did not contain

---

[200]  *In re Mortgage Lenders Network, USA, Inc.*, 395 B.R. at 876 (citation omitted).

[201]  *Id*. at 877.

[202]  *Id*. at 878.

[203]  *In re Fleming Companies, Inc.*, 323 B.R. at 149.

[204]  *Id*.

[205]  *In re Vision Metals, Inc.*, 311 B.R. 692, 702 (Bankr. D. Del. 2004).

any newly discovered facts.  In denying the motion, Judge Walrath, among other things, stated, that "[t]he Debtor does not offer an explanation for this delay."[206]

In *Coventry v. U.S. Steel Corp.*, the Third Circuit Court of Appeals also indicated how important it is for a movant to provide a reason for not seeking an amendment earlier.[207]

> It is certainly not inconceivable to us that instances could occur in which the failure to make a timely motion to amend a complaint would place an unwarranted burden upon a trial court, or be prejudicial to the party opposing the motion. In such circumstances, however, the **obligation of the trial court** in its disposition of the motion is **to articulate** the imposition or prejudice caused by the delay, and **to balance** those concerns against **the movant's reason for delay in asserting the motion**.[208]

As these cases illustrate, courts clearly expect a movant to explain why an amendment was not sought earlier.  In fact, trials courts are even obligated to consider movants' reasons in determining whether there is "undue delay."  This makes sense. RAG seems to suggest that litigants can come to court months or even years after the filing of an original pleading to seek an amendment without providing an explanation as to why the amendment was not sought earlier.  This view, however, is misplaced as it would exceed the already "liberal pleading philosophy of the federal rules."[209]

Thus**,** Plaintiff is required to provide a valid reason for seeking an amendment nearly two years after the commencement of this adversary proceeding, especially

---

[206] *Id.*

[207] 856 F.2d 514, 520 (3d Cir. 1988).

[208] *Id.*

[209] *Adams v. Gould, Inc.*, 739 F.2d 858, 864 (3d Cir. 1984).

considering that RAG filed its Motion to Amend after Defendants filed their motions for summary judgment.

### B.    Plaintiff's Reasons Provided for Its Delay Are Insufficient

In its reply, still arguing that no reason is required, RAG nevertheless provided three reasons for its delay in seeking an amendment.[210]    RAG contends that (1) "the tortious and contentious nature of discovery in the Adversary Proceeding and in the State Action;" (2) "the heightened pleading requirements in federal cases under the standards enunciated by *Twombly* and *Iqbal*," and (3) its "desire to not place an undue burden on other litigants through multiple amendments to the Complaint," prevented it from seeking an amendment of its Complaint sooner.[211]    RAG further explains that its reasons are "interrelated."

RAG's asserted reasons are not convincing, especially not compared to the reasons movants provided in the above-mentioned cases.    There, unsuccessful settlement discussions and changes in the law between the filing of the original pleading and the request to amend prompted movants to seek an amendment.

First, why would a contentious discovery process between the parties prevent RAG from filing an amended complaint?  To the contrary, if the discovery process is already "torturous and contentious," the parties should strive to conduct discovery only once and as completely and thoroughly as possible in order to minimize the risk of having

---

[210] RAG's Reply to Quad's Opposition at 9 - 11.

[211] RAG's Reply to Quad's Opposition at 9.

to repeat such "torturous and contentious" discovery.  For instance, 18 depositions were taken in this case.  Defendants could have asked questions pertaining to all proposed counts while the witnesses were available.

Plaintiff's second reason is equally unconvincing.  Plaintiff repeatedly asserts that the proposed "new" counts are based on the same facts as the Complaint.  Although discovery can, of course, reveal more factual details even though the facts are generally known, Plaintiff should have pled these claims in its Complaint.  The timing is also somewhat suspicious.  While Plaintiff submits that fact discovery "just recently closed," Defendants argue that the parties did not actively engage in fact discovery past February 2014.[212]  As such, RAG could have filed its Motion to Amend in March, April, May, or even June.  RAG waited until July and until summary judgment was almost fully briefed to file its Motion to Amend.  It is also interesting that RAG moved to add these claims after Debtor/Defendants in their Memorandum in Support of Summary Judgment stated, "RAG has not sued us for copyright infringement . . . or any other intellectual property-based claim."[213]

RAG's third reason is nothing more than a "last resort argument." RAG's intention "to save litigants from multiple amendments," is not a valid reason for counsel not to seek an amendment earlier.  Also, courts regularly grant requests for second, even third amendments if they are necessary and appropriate.  As mentioned, RAG also claims that it did not file its Motion to Amend earlier because of the heightened federal pleading

---

[212] *See supra* note 196.

[213] Debtor/Defendants' Memorandum in Support of Summary Judgment at 1.

standard, thereby admitting that it did not have sufficient factual content as to the claims to satisfy *Twombly* and *Iqbal*. Now it contends that it did not seek the amendment out of courtesy to other litigants whom it had such a "contentious and torturous" relationship with. Here, RAG seems to be indicating that it could have filed its Motion to Amend earlier, but refrained from doing so out of courtesy to other litigants. This does not make sense, especially not in light of RAG's own statement that its reasons for the delay are "interrelated."

As such, RAG has failed to provide a valid reason for a delay of this length. Thus, the delay is both undue and unjustified.

## III.    Bad Faith

RAG argues "[t]here is no bad faith here . . . amending the Complaint at this point in the litigation will afford the parties a complete understanding of the relief requested . . . ."[214] Debtor/Defendants contend that "[i]t appears that the only reason RAG did not move to amend sooner was because RAG apparently did not recognize the insufficiency of their claims until Defendants moved for summary judgment."[215]

"As with undue delay, in assessing bad faith, courts look to the reasons as to why a party did not seek to amend earlier."[216] As discussed above, the reasons provided by Plaintiff are not convincing. Additionally, the timing of the filing of Plaintiff's Motion to Amend is suspicious. As already mentioned, the parties were not actively involved in

---

[214] Motion to Amend at 6, 7.

[215] Debtor/Defendants' Opposition at 6.

[216] *In re Mortgage Lenders Network, USA, Inc.*, 395 B.R. at 879 (citation omitted).

fact discovery for months before RAG moved to amend.[217]  As such, RAG could have sought leave to amend before Defendants filed their motions for summary judgment.

The Eleventh Circuit Court of Appeals faced a similar situation in *Lowe's Home Centers, Inc. v. Olin Corp.,* in which the court held "[i]t is not an abuse of discretion for a district court to deny a motion for leave to amend a complaint when such a motion is designed to avoid an impending adverse summary judgment."[218]  There the court summarized:

> Apparently, after recognizing the likelihood of an adverse summary judgment ruling, Lowe's attempt to amend its complaint to remove its negligent design and negligent supervision and training claims and to add two additional claims: (1) negligent misrepresentation and (2) fraud). The record in this case reveals that despite numerous scheduling orders and joint stipulations regarding deadlines, Lowe's did not file its motion for leave to amend its first amended complaint until well after such deadlines had expired and not until over two months following the filing of Olin's motion for summary judgment. In fact, Lowe's did not file its motion for leave to amend until over a month had elapsed from the filing of its response to Olin's motion for summary judgment.[219]

In addition, Quad claims that "RAG's proposed amendment is in bad faith because it directly contravenes this Court's Sale Order that [among other things] expressly finds that Quad is not a successor to any of the Debtors . . . ."[220]  The Court agrees but will address the issue of successor liability *infra* in connection with Defendants' motions for summary judgment.

---

[217] *See supra* note 196.

[218] 313 F.3d 1307, 1314 (11th Cir. 2002).

[219] *Id.*

[220] Quad's Opposition at 17.

RAG now recognizes that its claims are insufficient. RAG's reasons for not seeking an amendment sooner are not convincing.  The timing of its Motion to Amend is suspicious, and its argument that fact discovery just recently closed was, as Defendants contend, deceiving.  As such, the Court finds that RAG's motion was filed in bad faith.

**IV**.    **Futility**

Futility "means that the complaint, as amended, would fail to state a claim upon which relief could be granted."[221]  "The standard for assessing futility is the 'same standard of legal sufficiency as applies under [Federal] Rule [of Civil Procedure] 12(b)(6).'"[222]  Fed.R.Civ.P. 12(b)(6) is made applicable to this adversary proceeding by Fed.R.Bankr.P. 7012(b).[223]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim [for] relief that is plausible on its face.'"[224]  At this stage in the proceeding, it is not the question of "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."[225]  Since the *Twombly* and *Iqbal* decisions, "pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading."[226]  This new standard

---

[221] *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 175 (3d Cir. 2010) (citations omitted).

[222] *Id.* at 175 (Citation omitted).

[223] *In re Troll Communications, LLC*, 385 B.R. 110, 116 (Bankr. D. Del. 2008).

[224] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)).

[225] *Scheuer v. Rhodes*, 416 U.S. 232, 236, abrogated on other grounds by, Harlow v. Fitzgerald, 457 U.S. 800, 814-15 (1982); *see also Rosener v. Majestic Mgmt., Inc.* (*In re OODC, LLC*), 321 B.R. 128, 134 (Bankr. D. Del. 2005).

[226] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

requires "a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."[227]  It is insufficient to provide "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . ."[228]  Under the heightened standard, a complaint "must contain either direct or indirect allegations respecting all the material elements necessary to sustain recovery under some *viable* legal theory."[229]  The Court, in order to determine whether a claim meets this requirement, must "draw on its judicial experience and common sense."[230]  In *Fowler*, the Third Circuit articulated a two-part analysis to be applied in evaluating a complaint.[231]  First, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."[232]  Second, the court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"[233]

### A.    Successor Liability as to Defendant Quad

RAG, for the first time in this adversary proceeding, raised the issue of successor liability in its opposition to Defendants' motion for summary judgment.[234]  It asserts that Quad has "successor liability for the alleged tortious conduct based upon the fact that the

---

[227] *Id.*

[228] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)).

[229] *Twombly*, 550 U.S. at 562.

[230] *In re USDigital, Inc.*, 443 B.R. 22, 34 (Bankr. D. Del. 2011).

[231] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

[232] *Id.*

[233] *Id.* at 211.

[234] *Riverside Acquisition Group LLC d/b/a/ Com-Pak Services, Inc.'s Memorandum of Law in Opposition to Debtor Defendants Vertis Holdings, Inc.'s, Vertis, Inc.'s and 5 Digit Plus, LLC's and Defendant Quad/Graphics Marketing, LLC's Respective Motions for Summary Judgment on all Counts* ("RAG's Opposition to Summary Judgment") at 60.

transaction between Quad and Vertis amounted to a consolidation or merger; Quad is a continuation of Vertis; and Quad undertook to do essentially the same activities Vertis performed."[235]

Because this issue was raised in connection with the motions for summary judgment, it is fully addressed *infra*. In short, however, the Court find that Quad does not have successor liability as to the alleged tortious conduct of the Debtors.

### B.    The Proposed Claims[236]

### (i)    Count VII (Violations Under New Jersey Computer Related Offense Act ("CROA"))

Quad argues that Plaintiff "does not plead any facts to suggest that Quad, specifically, acted purposefully and knowingly in any conduct in violation of CROA."[237] Quad further contends that it cannot possibly be held liable because, the factual allegations "concern acts and conduct in 2011 and 2012, well before Quad's January 2013 purchase of the Debtors' assets."[238]

Plaintiff disagrees and argues that "when read as a whole, the proposed Amended Complaint adequately states claims against Quad under the . . . CROA . . . ."[239] To support

---

[235]  RAG's Opposition to Summary Judgment at 60.

[236]  Debtor/Defendants' Opposition n. 9. Debtor/Defendants did not address "futility" in their brief. However, they "incorporate by reference the futility arguments raised by Defendant Quad in opposition to RAG's Motion."

[237]  Quad's Opposition at 19.

[238]  Quad's Opposition at 20.

[239]  RAG's Reply to Quad's Opposition at 13.

its position that the proposed Amended Complaint is not "thread bare," but instead contains many factual details, the Plaintiff states:

> The Amended Complaint contains allegations supporting Plaintiff's claims of purpose and knowledge under CROA, or intent under CFAA. Plaintiff details communications between and among former employees of the Plaintiff during their employment, including Vincent Acerbo, Mark Beato, Linda H. Oh and Patricia Pizzutullo . . . with Donald Clemmer, . . . David Colatriano . . . and other employees of Debtors evidencing a scheme to build a business to compete against Plaintiff.

> The Amended Complaint specifically describes Quad's role in these offenses. Mr. Beato, a former employee of Plaintiff, transitioned directly from employment from one of the Debtors to Quad. Further, the Amended Complaint details how data from 5 Digit's computers and servers (which contained items improperly obtained from Riverside) was moved to Quad's network.[240]

> The Computer Related Offenses Act, N.J. Stat. Ann. Section 2A:38A-3, provides:

> A person or enterprise damaged in business or property as a result of any of the following actions may sue the **actor** therefore in the Superior Court and may recover compensatory and punitive damages as the cost of the suit, including a reasonable attorney's fee, costs of investigation and litigation.[241]

The term "actor" is not defined, however, courts have indicated, that "a plain reading of the statute supports the conclusion that the New Jersey legislature intended that the statute covered **only those 'actors' who *directly accessed*** the computer at issue."[242]

---

[240] RAG's Reply to Quad's Opposition at 13-14.

[241] *PNC Mortgage v. Superior Mortgage Corp.*, Case No. 09-5084, 2012 WL 627995, *4 (E.D. Pa. Feb. 27, 2012).

[242] *Id*. n. 1.

47

In a recent New Jersey case, the court faced a complaint in which the plaintiff alleged a claim under CROA against two entities.[243]  Plaintiff asserted, "Defendants, **through the Founders**, knowingly accessed Mu Sigma's computers without authorization, and stole data belonging to Mu Sigma in violation of the New Jersey Computer-Related Offenses Act, and the Federal Computer Fraud and Abuse Act."[244] The court stated that "to the extent that Counts CROA and CFAA . . . assert that Defendants are vicariously liable for the intentional acts of the Founders, this claim cannot succeed.  Under federal and New Jersey law, vicarious liability requires an agency relationship.  In that connection, an agency relationship exists if the principal exerts control over 'the time, manner, and method of executing the work.'"[245]  The court found that it was impossible for the two corporate defendants to have been in control of the employees at the time they were not yet even formed.[246]

Although Quad was in existence at the time of the alleged misconduct, it did not purchase Debtors' assets until 2013.  As such, it was not possible for Quad to exercise any kind of control over the individuals at the time of the alleged wrongdoing.

The same reasoning can be applied with respect to the Debtor/Defendants. Although Clemmer and other people at Vertis communicated and "worked with"

---

[243] *Mu Sigma, Inc. v. Affine, Inc.*, Case No. 12-1323, 2013 WL 3772724 (D.N.J. July 17, 2013) [hereinafter *Mu Sigma I*].

[244] *Id.* at *9.

[245] *Id.* at *10 (citation omitted).

[246] *Id.* ("At that time, the Founders were employees of Mu Sigma, and AL and AAC were not yet in existence. Thus, it logically follows that Defendants cannot be held vicariously liable for the alleged intentional acts of the Founders when the corporate defendants in fact did not exist.").

Pizzutillo, Acerbo and the other individuals to establish 5 Digit, Debtor/Defendants, at the time of the alleged wrongdoing, did not exercise control over them.  In fact, most of the individuals were still employed by RAG.  As such, Defendants cannot be held vicariously liable for the acts of the individuals.  To the extent RAG argues that the misappropriation was ongoing after some of the individuals joined Vertis/5 Digit and later Quad, this argument fails as well as the time of "access" appears to be determinative for a claim under CROA.

Thus, allowing the assertion of a claim for violation of CROA would be futile.  The Defendants do not constitute "actors" pursuant to the CROA and the Defendants can not be held vicariously liable.

### (ii) Count VIII (Violations Under the Computer Fraud Act ("CFAA"))

Section 1030(a)(2)(c) of the CFAA "imposes liability upon any person who 'intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from a protected computer.'"[247]  In *Mu Sigma I*, the court addressed the CROA and CFAA claims together as the issue of vicarious liability pertained to both claims.[248]  As such, the Court incorporates its discussion of vicarious liability above.

RAG's CFAA claim fails for another reason.  18 U.S.C. Section 1030(g) provides that "any person who suffers **damage** or **loss** by reason of a violation of this section may

---

[247] *Id*. at *6.

[248] *Id*. at *9.

maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."[249]

The CFAA defines "damages" as "any impairment to the integrity or availability of data, a program, a system, or information."[250] "Loss" is defined as "any reasonable cost to any victim, including the **cost of responding** to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of **interruption of service**."[251]

In addressing "loss" and whether it is compensable under the CFAA, one Pennsylvania district court has held, "Defendants . . . are not claiming to have lost money because their computers were inoperable.  Rather, they are claiming to have been denied potential business opportunities as a result of [the defendant's] unauthorized access.  This alleged loss of business opportunity is simply not compensable under the CFAA."[252]

Here, Plaintiff alleges that:

> [a]s a result of Debtors' and Quad's unauthorized access and use of the information contained within Plaintiff's computer system, it has suffered and will continue to suffer substantial **losses** exceeding $5,000 **in responding** to Debtors' and/or Quad's actions. And **taking remedial steps**

---

[249] *Trading Partners Collaboration, LLC v. Kantor*, 09-0823, 2009 WL 1653130, *6 (D.N.J. 2009) (citation omitted).

[250] *PNC Mortgage v. Superior Mortgage Corp.*, Case No. 09-5084, 2012 WL 627995, *3 (E.D. Pa. Feb. 27, 2012). (citing 18 U.S.C. Section 1030(e)(8)).

[251] *Id.* (citing 18 U.S.C. Section 1030(e)(11)).

[252] *See id.* at *3 (citing *Crown Coal & Coke Co. v. Compass Point Res., LLC*, No. 07-1208, 2009 WL 1806659 (W.D. Pa. June 23, 2009).

to prevent their further actions pursuant to 18 U.S.C. Section 1030(a)(5)(B)(i) [sic].

In addition to being conclusory, the loss claimed is not compensable under the CFAA. Plaintiff does not allege anywhere in its Amended Complaint that its computer system has been damaged as a result of Defendants' alleged misconduct. Further, by stating "in responding to Debtors' and/or Quad's actions" and "taking remedial steps to prevent their further actions," Plaintiff appears to be referring to damages similar to the ones the plaintiff alleged in *Crown Coal*, i.e., the denial of "potential business opportunities as a result of [Defendants'] unauthorized access." As such, RAG does not claim any harm/loss in connection with its computer system, its operations or any other loss compensable under CFAA.

Thus, asserting a claim for violation of the CFAA would be futile for two reasons: (1) the lack of an agency relationship at the time of the alleged wrongdoing; and (2) because the loss is not compensable under the CFAA.

### (iii)    Count IX (Claim Under the NJ Trade Secret Act)

Defendants assert that the New Jersey Trade Secret Act (T.S.A.) is inapplicable as it "became effective after the filing of this action" and because "the alleged acts of misappropriation . . . began in 2011 and continued into 2012."

Plaintiff disagrees arguing, "the exact timing of the misappropriation of Plaintiff's trade secrets is a question to be resolved by the trier of fact."[253] Plaintiff further argues that "Quad used and continues to use" its data.

---

[253] RAG's Reply to Quad's Opposition at 15.

Defendants are wrong in stating that the T.S.A. "became effective after the filing of this action." RAG commenced the adversary proceeding in December 2012. The T.S.A. became effective on January 5, 2012.[254]

The New Jersey Trade Secrets Act provides that the following acts constitute misappropriation: [255]

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent of the trade secret owner by a person who:

(a) used improper means to acquire knowledge of the trade secret; or

(b) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was derived or acquired through improper means; or

(c) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired through improper means.

The T.S.A. defines "'trade secret' broadly as 'information . . . without regard to form" that has economic value as a result of not being known to others who might derive economic value from its use and that is the subject of reasonable efforts to maintain its secrecy.'"[256]

The items at issue in this case, i.e., software, customer lists and other proprietary

---

[254] *Mu Sigma I* at 8.

[255] *StrikeForce Technologies, Inc. v. WhiteSky, Inc.*, Case No. 13-1895, 2013 WL 3508835, *8 (D.N.J. July 11, 2013) (quoting N.J.S.A. 56:15–3).

[256] *Id.*

information, qualify as "trade secrets," as they have economic value as a result of not being known to others . . . ."

However, the T.S.A. "does not apply to misappropriation occurring before the effective date," which was January 5, 2012.[257]  In *Mu Sigma I*, the court denied the motion as to this claim stating "the bulk of the allegation relating to the misappropriation of Plaintiff's confidential information by the Founders took place in 2010, and Plaintiff filed this suit in state court in 2011, which occurred prior to the passage of the T.S.A. As such, based on the timing, the T.S.A. cannot address these alleged wrongdoings."[258]  Statutory notes to the T.S.A. further reveal that "[w]ith respect to a continuing misappropriation that began prior to the effective date, the act also does not apply to the continuing misappropriation that occurs after the effective dates."[259]

RAG commenced this adversary proceeding after the T.S.A.'s effective date. However, the "bulk" of the alleged misconduct, if not all of the misconduct, took place in 2011 before the Act was passed.  As the session notes indicate, the timing of the alleged misappropriation of the trade secrets is determinative.  As such, to the extent Plaintiff alleges that the misappropriation of its trade secrets is ongoing, the claim must also fail based on the content of the session laws referenced above.

Thus, allowing assertion of a claim for violation for the NJ Trade Secret Act would be futile.

---

[257] *Mu Sigma I* at *8 (citing Trade Secrets Act of 2010, ch. 161, N.J. Laws 780 (2012)).

[258] *Id*. at *8.

[259] *Id*.

### (iv) Count X (Trespass to Chattels)

In its proposed Amended Complaint, RAG alleges:

Debtors and/or Quad **accessed and interfered** with Plaintiff's computer system, programs, software, and Confidential and Proprietary Information without authorization. Debtors and/or Quad's unauthorized access resulted in an interference with Plaintiff's exclusive possession of its computer system, programs, software, Confidential and Proprietary Information without authorization.[260]

Defendants respond that Plaintiff has failed to plead that it has been "temporarily deprived of the right to use or possess its property."[261] In addition, Defendants argue that RAG has failed to allege that it has been deprived of *tangible* property.

Defendants are correct in stating that generally, under New Jersey law, a cognizable claim for trespass exists "when personal property, in the actual use of the owner, is injured or taken by a trespasser, so that the owner is deprived of the use of it."[262] Defendants are also correct in asserting that Plaintiff failed to plead that is has been deprived of tangible property.

Plaintiff disagrees, however, citing to *SCS Healthcare Mktg., LLC v. Allergan USA, Inc.*, a fairly recent New Jersey Superior Court case addressing, among other things, the difficulties in applying common law claims to the misappropriation of computer data.[263] In this case, the court relying on the views of commentators, declined to dismiss plaintiff's trespass to chattels claim stating:

---

[260] Proposed Amended Complaint at ¶¶ 129, 130.

[261] Quad's Opposition at 22.

[262] *Arcand v. Brother* Intern. Corp., 673 F. Supp. 2d, 282, 312 (D.N.J. 2009) (citation omitted).

[263] 2012 WL 6565713, *7 (N.J. Super. Ch. Dec. 7, 2012).

Several commentators have indicated the appropriateness of asserting trespass to chattel claims in the context of unauthorized computer access. One reason that an action for trespass to chattels is favored is that unauthorized access to a computer **does not deprive the owner of the value and/or use of the computer, as is typically required to sustain an action in conversion.** Courts have been reluctant to find conversion where there is no tangible property taken. Trespass to chattels has been analogized to trespass to land in that an intrusion which is sufficient to interfere with the owner's exclusive possession can give rise to a claim.[264]

The court held:

In the present case plaintiff alleges that defendants' access to its computer system was unauthorized and/or exceeded the scope of the access which plaintiff had previously authorized. Hence, on its face, the court at this juncture is unable to conclude that plaintiff's Complaint fails to state a cause of action for trespass to chattels and accordingly the motion to dismiss Count 5 is denied.

New Jersey is a notice pleading state.  In contrast, RAG has not pled sufficient facts to satisfy *Twombly* and *Iqbal*.  RAG, merely alleges that the "unauthorized access resulted in an interference with Plaintiff's exclusive possession."  The Proposed Complaint is devoid of any facts regarding the "resulted interference."  Thus, allowing assertion of a claim for trespass to chattels would be futile.

### v. Count XI - Intentional Interference with Contractual Relationships

Defendants argue that Plaintiff failed to allege several of the required elements for a claim for intentional interference with a contractual relationship.[265]  They contend that

---

[264] *Id. (*citing ROWE, N.J. BUSINESS LITIGATION (2d ed.), Section 16-5:2, at 420-421 (2006) (citations omitted).

[265] Quad's Opposition at 23.

RAG needed to prove that it had "lost" a specific contract because of Defendants' actions.[266]

Plaintiff rejects that it has to "identify a specific contract with a specific customer" in order to satisfy the pleading standard.[267]  It further argues that it sufficiently identified the confidentiality and non-compete agreements between RAG and the Former Employees with which the Defendants allegedly interfered.[268]  In addition, it contends that the Amended Complaint as a whole "evidences the concerted effort to interfere with Plaintiff's contractual relationships with its existing customers . . . ."[269]

Under New Jersey law, the Plaintiff must allege "(1) the existence of a protected interest; (2) interference with malice, (3) a reasonable likelihood that the interference caused the loss of a prospective economic gain; **and** (4) the injury caused the damages."[270]

### (a) The Existence of a Specific Interest and a Reasonable Likelihood that Interference Caused the Loss of a Prospective Gain

In order to properly plead the existence of a protected interest and a reasonable likelihood that interference caused the loss of a prospective gain under New Jersey law, a plaintiff must allege, among other things that "it had a reasonable expectation of economic benefit, that defendants had knowledge of that expectancy, and that defendants wrongfully and intentionally interfered with that expectancy."[271]

---

[266] *Id.*

[267] RAG's Reply to Debtor/Defendants' Opposition at 18.

[268] Proposed Amended Complaint at ¶¶ 19, 133.

[269] *Id.*

[270] *Mu Sigma I* at *4 (citation omitted).

[271] *Id.*

For example, the *Mu Sigma I* court dismissed a claim for tortious interference with contractual relations where plaintiff merely plead that "many of [its] clients were and are being contacted by Defendants, specifically through the use of information gleaned from [misappropriated materials] and as a result, a number of Mu Sigma's clients, including a major warehouse club, terminated their relationships with Plaintiff due to the malicious influence."[272]  The court held that this complaint as pled "does not come close to setting forth the facts necessary to plead the required elements of the claim."[273]  With respect to the contract the plaintiff identified, the court found that "plaintiff does not inject any precision as to whether it had a reasonable expectation of economic benefit from this client, and perhaps more damning, whether defendants had knowledge of such expectancy or how defendants interfered . . . ."[274]

In *Mu Sigma II*, however, the court found that plaintiff cured the deficiencies by providing more factual content as to this claim. The court noted that "Plaintiff has identified . . . certain of Plaintiff's protected economic clients and interests from whom the Founders attempted to solicit business by using . . . 'stolen' proprietary information the Founders obtained while they were employed at Mu Sigma."[275]  Now the plaintiff claimed that "Anand intentionally interfered with the business relationship of Plaintiff and a global computer software developer and other prospective customers . . ." **and** that

---

[272] *Id*. at *5.

[273] *Id*.

[274] *Id*.

[275] *Mu Sigma, Inc. v. Affine, Inc.*, 2014 WL 1217961, at *5 (D.N.J. March 24, 2014) [hereinafter *Mu Sigma II*].

Defendants "**actively solicited and employed [Mu Sigma's] employees in direct violation of the non-compete and non-solicitation** provisions of the respective employee's agreements with Mu Sigma without any justification or excuse."[276]

Here, RAG alleges the following:

Through the actions described more fully above, Debtors and/or Quad interfered with Plaintiff's employee and client contractual relationships. Debtors and/or Quad acted with malice as they intentionally committed wrongful acts when interfering with Plaintiff's contractual relationships and did so without an excuse or justification.

As a result of Debtors and/or Quad's intentional interference with Plaintiff's contractual relationships, Plaintiff sustained actual damages.[277]

In a preceding paragraph, RAG references its customers.

Paragraph 26 states the following:

[T]he Former Employees, working with Clemmer and others, actively solicited Plaintiff's customers on whom they called while employed by Plaintiff so that 5 Digit would have business with which to commence operations.

As in *Mu Sigma I*, RAG has failed to sufficiently plead the existence of a protected interest and a reasonable likelihood that the alleged misconduct caused the loss of a prospective economic gain. In fact, RAG pleads even less than the plaintiff in *Mu Sigma I* who at least mentioned one particular client in its complaint. RAG did not plead any information as to one particular client. As such, RAG has failed to plead sufficient facts as to "a reasonable expectation of economic benefit from [a] client."

---

[276] *Id*.

[277] Proposed Amended Complaint at ¶¶ 133-135.

Nonetheless, RAG's proposed Amended Complaint contains sufficient facts as to the alleged solicitation of Com-Pak's and RAG's Former Employees.  The proposed Amended Complaint provides many details as to how Clemmer "solicited" the former employees who were parties to certain non-compete and confidentiality agreements.[278] But, as explained above, the Amended Complaint does not identify any client and prospective economic gain RAG allegedly lost.  As such, this claim cannot survive. This is the difference between the case *sub judice* and *Mu Sigma II* where the court held that the plaintiff cured the deficiencies when it alleged more details as to particular clients **and** as to the solicitation of employees.

### (b) *Loss or Damages*

RAG merely states that "[a]s a result of Debtors' and/or Quad's intentional interference with Plaintiff's contractual relationships, Plaintiff sustained actual damages."[279]  This is conclusory and not sufficient to satisfy *Twombly* and *Iqbal*.

### (c) *Malice*

New Jersey courts have interpreted this requirement as "not a general ill-will towards the victim, but as intentional interference without justification or excuse."[280]  In this context, New Jersey courts have repeatedly found that a decrease in competition or

---

[278] *See e.g.*, Proposed Amended Complaint at ¶¶ 19-23.

[279] *Id*. at ¶ 135.

[280] *Mu Sigma I*, at *4 (citation omitted).

an increase in a financial interest is insufficient to plead malice.[281]  However, this is

exactly what RAG alleges.

RAG argues that certain allegedly misappropriated proprietary information

"gives Debtors an unfair economic advantage, as they know what they need to do on

terms of pricing, in order to undercut Plaintiff and compete unfairly."[282]  RAG does not

plead any other facts as to how Defendants acted with malice. As such, RAG did not

sufficiently plead the element of malice.

For all the reasons above, the Court finds that assertion of a claim for intentional

interference with contractual relationships would be futile as to all Defendants.

### (vi) Proposed Count XII (Intentional Interference with Prospective Business Advantage)

Defendants contend that RAG failed to plead sufficient facts to prove that

Defendants have "intentionally caused RAG to lose some specific economic benefit and

that without [their] actions RAG would likely have received that specific benefit."

Plaintiff responds that it has met its burden. It specifically argues that the proposed

Amended Complaint shows that "Plaintiff had an expectation of maintaining dominance

in its competitive industry and its accompanying economic advantage, which were

damaged by the machinations of these defendants."  RAG restates paragraphs 139 and

141:

> Plaintiff alleges that it had a protectable right, both prospective contractual
> and economic advantages, and that it sustained damages due to the loss of

---

[281]  *Id*. citation omitted).

[282]  Proposed Amended Complaint at ¶ 24.

a prospective contractual and economic gain from Debtors and/or Quad's interference.

To properly state this claim, a plaintiff must allege "(1) the existence of a reasonable expectation of an economic advantage, (2) the interference was done intentionally and wilth malice; (3) absent the interference there was a reasonable probability that the plaintiff would have received the anticipated economic benefits; [and] (4) the injury caused the damage."[283]  In order to meet this burden, a plaintiff must plead more than "mere hope that [it] would have entered into some future arraignment."[284]

RAG has not provided sufficient facts as to this claim.  As analyzed above, RAG did not plead any facts to support that it had a "reasonable expectation of an economic benefit" or that Defendants acted with malice.  As such, RAG's claim amounts to a "mere hope that [it] would have entered into some future arraignment" insufficient to survive a motion to dismiss and allowing assertion of a claim for intentional interference with contractual relationships would be futile.

### (vii)  Count XIII (Unfair Competition)

Defendant Quad argues that RAG's claim is futile as it failed to plead facts that "distinguish its unfair competition claim from its claims for tortious interference." Quad further asserts that RAG failed to specify any conduct on the part of Quad that would suggest Quad "itself did anything to misappropriate RAG's information."

---

[283] *Mu Sigma I*, at *3.

[284] *Id*.

Plaintiff disagrees asserting that its claim is not futile as the "unfair competition continued after the formation of 5 Digit, with knowledge of the Debtors, and after Quad purchased substantially all of the Debtors' assets and employed certain of the Former Employees."[285]

In New Jersey, "[t]he common law tort of unfair competition historically has been considered a subspecies of the class of torts known as tortious interference with business or contractual relations."[286]  As such, New Jersey courts have regularly dismissed claims for unfair competition "where they are duplicative of claims for tortious interference."[287]

### (a)    Did RAG Plead Different Facts To Distinguish Its Proposed Unfair Competition Claim from Its Proposed Claims for Intentional Interference with Contractual and Prospective Business Relationships?

RAG's claim for unfair competition is worded differently and contains additional facts.  RAG adds that Debtors and/or Quad engaged in unfair competition by, among other things, [p]rovid[ing] financial incentives and benefits not available to other competing companies and took steps to prevent the disclosure of their non-competitive agreements to the Plaintiff and other competing companies."  These allegations are not contained in the proposed counts for intentional interference with contractual or prospective business relationships.  As such, RAG has pled facts that distinguish its claim for unfair competition from its claims for intentional interference with contractual and prospective business relationships.

---

[285]  RAG's Reply to Quad's Opposition at 19.

[286]  *Diversified Industries, Inc. v. Vinyl Trends, Inc.*, 2014 WL 1767471, at *6 (D.N.J. 2014) (citation omitted).

[287]  *Id.*

*(b)        Did RAG Properly Plead This Claim?*

In *Mu Sigma I*, the plaintiff sought relief for unfair competition in connection with the alleged misappropriation of its trade secrets.[288]   There, the plaintiff alleged that the founders, who were employees of Mu Sigma, misappropriated certain proprietary information, such as client lists, pricing information and other materials.[289]  The founders then allegedly passed that information to defendant entities, which "wrongfully possess and continue[d] to use this information to Plaintiff's detriment."[290]

The court dismissed the claim finding that "the crux of [plaintiff's] misappropriation claim turns on the direct taking of plaintiff's creative work by defendants . . . [and] that plaintiff has not alleged that Defendants were directly involved with the taking of plaintiff's proprietary information."[291]  The court continued stating that "plaintiff's basis for unfair competition boils down to bare assertions that defendants continue to use plaintiff's confidential business information."[292]  In *Mu Sigma II*, the court found that plaintiff cured the deficiencies by "alleging specific wrongful acts of [entity] defendants, albeit through the actions of the Founders . . . ."[293]

Here RAG has met its burden. In contrast to the plaintiff in *Mu Sigma I*, RAG alleges that "Defendants were directly involved with the taking of plaintiff's proprietary

---

[288]  *Mu Sigma I*, at *7.

[289]  *Id*. at *1.

[290]  *Id*.

[291]  *Id*. at *8.

[292]  *Id*.

[293]  *Mu Sigma II*, at *6.

information." For instance in paragraph 31 and 35 of the proposed Amended Complaint,

RAG provides the following details:

> Emails between and among Clemmer, the Former Employees and David Colatriano, President and COO of Vertis, and various other of Debtors' employees scheming to build a business to compete against Plaintiff.
> Emails between and among Clemmer, the Former Employees, David Colatriano and various other of Debtors' employees attaching software code belonging to Plaintiff . . . .[294]

> Vertis supplied the laptop to Mr. Clemmer. Mr Clemmer then provided the laptop to Mr. Acerbo to provide to Ms. Pizzutillo, so that Ms. Pizzutillo could perform required tests for Mr. Clemmer.[295]

As in *Mu Sigma II*, Plaintiff has sufficiently pled that Defendants are utilizing

RAG's confidential information to unfairly compete with Plaintiff on behalf of, and with

the knowledge of, Defendants "by alleging specific wrongful acts of Defendants, albeit

through the actions of the [individuals]."

However, RAG has not met its burden with respect to Quad. Quad did not

purchase the assets until January, 2013. The proposed Amended Complaint is devoid of

any specific facts as to how and what information Quad utilized. This claim, as pled, is

therefore similar to *Mu Sigma I* as it "boils down to bare assertions that [Quad] continue[s]

to use Plaintiff's confidential business information." For example, RAG states, "[t]he

employment of Mr. Beato transitioned directly from 5 Digit to Quad."[296] RAG further

---

[294] Proposed Amended Complaint at ¶ 31.

[295] *Id*. at ¶ 35.

[296] Proposed Amended Complaint at ¶ 57.

alleges, that "Mr. Arias moved all of the data that originated from the 5 Digit computers and servers to Quad's network."[297]

Thus, RAG's claim for unfair competition is futile with respect to Quad, but properly pled as to Debtors/Defendants.

### (viii) Count XIV (Common Law Aiding and Abetting)

RAG alleges the following:

Debtors and/or Quad aided and abetted all of the actions described more fully above.

Debtors and/or Quad performed all of the wrongful acts described more fully above.

Debtors and/or Quad were aware of their role as part of an overall tortious activity at the time they provided assistance to the Former Employees and Donald Ray Clemmer.

Debtors and/or Quad knowingly and substantially assisted the principal violations described more fully above.

As a result of Debtors' and/or Quad's aiding and abetting, Plaintiff sustained damages.[298]

With respect to Quad, RAG argues that Quad has "encouraged, if not actively participated, in this misconduct . . . through the purchase of substantially all of their assets."[299]  Quad disagrees stating that the "allegation is completely implausible, as all of the Debtors' alleged tortious conduct occurred well before the closing of the Asset Sale to

---

[297] *Id.* at ¶ 76.

[298] *Id.* at ¶¶ 148-152.

[299] RAG's Reply to Quad's Opposition at 20 citing Proposed Amended Complaint at ¶ 74 ("In January 2013, the Debtors and Quad closed the sale of substantially all of Debtors' assets.").

Quad."[300]  Additionally, Quad alleges that all of RAG's claims are futile and that as such, "there would be no underlying tort that could serve as the basis for RAG's aiding and abetting claim."[301]

Under New Jersey law, "[a] claim for aiding and abetting . . . requires **proof** of an **underlying tort**."[302]  A claim for aiding and abetting exists "where **one party** knows that the **other's conduct** constitutes a breach of duty and gives **substantial** assistance or encouragement to the **other** so to conduct himself."[303]

This claim is problematic for multiple reasons.

First, RAG seems to be alleging, at least in part, that Defendants aided and abetted their own conduct.[304]  This is not proper as a claim for aiding and abetting requires, among other things, that "**one party** knows that the **other's conduct** constitutes a breach of duty . . . ."  The parties did not address this issue.  There are cases that discuss "aiding and abetting ones own conduct" in connection with claims brought under the New Jersey Law Against Discrimination ("LAD").  The issue there is frequently whether a supervisor can be held liable for aiding and abetting  "when the only wrongful conduct at issue is the supervisor's own acts of harassment or discrimination."[305]  The Third Circuit, in one

---

[300]  Quad's Opposition at 26.

[301]  *Id*.

[302]  *State of N.J., Dep't of Treasury, Div. of Inv. Ex rel. McCormac v. Qwest Commc'ns Int'l, Inc.*, 904 A.2d 775, 784 (N.J. Super. Ct. App. Div. 2006).

[303]  *Id.* at 782.

[304]  Proposed Amended Complaint at ¶ 148 ("Debtors and/or Quad aided and abetted all of the actions described more fully above.").

[305]  Lawrence J. Del Rossi & Joshua D. Rinschler, *Aiding and Abetting Your Own Conduct*, N.J.L.J. (2012), http://www.drinkerbiddle.com/resources/publications/2010/aiding-and-abetting-your-own-conduct--

of those cases addressed this "somewhat awkward theory" holding that "[a] supervisor, under New Jersey law, has a duty to act against harassment.  This duty can be violated by deliberate indifference or affirmatively harassing acts.  When a supervisor flouts this duty, he subjects himself and his employer to liability."[306]   The Court was unable to finds any other case law on this issue.  Aiding and abetting ones own behavior is limited to the special circumstances involving a supervisor's misconduct.  As such, the Court finds that RAG's claim for aiding and abetting is futile to the extent it is based on Defendants' own conduct.

Second, to the extent RAG alleges that Defendants aided and abetted tortious conduct of the individuals/former employees involved in this case, the Court is not in the position to decide this issue.  The individuals/former employees are not parties to this adversary proceeding.  The claims addressed and evaluated thus far, are all claims brought against the Defendants as entities.  There is no proof as to any underlying tort committed by any of the individuals involved in this case.  For this reason alone, this claim fails.

Third, assuming Defendants aided and abetted the individuals in their "tortious activities," the question is whether this assistance rose to the level of   "substantial assistance."  Vertis provided a laptop to Ms. Pizzutillo to perform certain tests.  The bulk

---

an-awkward-theory-of-personal-liability-for-supervisory-employees-under-the-new-jersey-law-against-discrimination.

[306]  *Id*. (citation omitted).

of the alleged misconduct occurred prior to Clemmer establishing 5 Digit.  In addition,

RAG failed to plead sufficient facts as to what damages it sustained.

For all these reasons, RAG failed to properly plead a claim for aiding and abetting and

allowing assertion of the claim would be futile.

### (ix) Count XV (Civil Conspiracy)

In order to state a claim for civil conspiracy, a plaintiff must allege "a combination

of **two or more persons** acting in concert to commit an unlawful act, or to commit a lawful

act by unlawful means, the principal element of which is an **agreement between the**

**parties** to inflict a wrong against or injury upon another, and an overt act that results in

damage."[307]  In New Jersey, it is well settled that a "corporation which acts through

authorized **agents and employees** . . . cannot conspire with itself"[308] as "acts of the agents

are the acts of the corporation."[309]  In addition, New Jersey courts have dismissed claims

for civil conspiracy when the underlying tort is dismissed.[310]

Plaintiff alleges, among other things that "Debtors and/or Quad acted in concert

with **their employees**, the **Former Employees**, Donald Ray **Clemmer** and **other**

**individuals** to commit **unlawful and tortious acts**."[311]  To the extent this claim alleges

that the Debtors and/or Quad conspired with their own employees, including Clemmer,

this claim must be dismissed as a "corporation, which acts through authorized **agents**

---

[307] *Mu Sigma II,* at *6 (citation omitted).

[308] *Id*.

[309] *Id*.

[310] Mu Sigma I, at *6 (citation omitted).

[311] Proposed Amended Complaint at ¶ 156.

**and employees** . . . cannot conspire with itself."[312]  To the extent, RAG alleges that "Debtors . . . acted in concert with **. . .** the Former Employees, . . . to commit unlawful and tortious acts," the claim could survive at least with respect to the alleged misconduct which took place prior to the former employees joining 5 Digit (before they became employees).  The proposed Amended Complaint contains many details as to the communications and actions between Clemmer and the former employees of RAG.

The claim would be dismissed as to Defendant Quad.  Quad did not purchase the assets until 2013.  As such, Quad never entered into any agreement with anyone to inflict injury upon RAG.

Thus, the claim for civil conspiracy is not properly pled as to Defendant Quad and would be futile.  The claim is not futile with respect to the Debtor/Defendants, but only to the extent they conspired with former employees of RAG to unfairly compete with RAG prior to them joining 5 Digit.

### *(x) Count XVI (Common Law Misappropriation of Trade Secrets)*

"The basic elements of a trade secrets claim under New Jersey law are: (1) the existence of a trade secret, (2) communicated in confidence by the plaintiff to the employee, (3) disclosed by the employee in breach of that confidence, (4) acquired by the competitor with knowledge of the breach of confidence, and (5) *used by the competitor to*

---

[312] The plaintiff in *Mu Sigma II* made similar allegations.  There, the court held that because plaintiff alleged that "Al and AAC [the two defendants] have conspired with the founders to interfere with Plaintiff's prospective economic advantage and contractual relations, . . . and because the wrongful actions of the Founders are taken in their official capacity on behalf of Defendants," that the alleged acts cannot form the basis of a conspiracy claim.

*the detriment of the plaintiff.*"[313]   Further, New Jersey courts repeatedly held "that trade secrets include customer lists and information relating to merchandising, costs and pricing."[314]

Plaintiff has sufficiently pled the first four elements.  The complaint, read as a whole, includes details as to the non-compete and confidentiality agreements many of the former employees entered into at RAG.[315]    The proposed Amended Complaint further entails many details as to the alleged misconduct. The question is whether Plaintiff has sufficiently pled the fifth prong, *i.e.*, that Defendants used the information to the detriment of the Plaintiff.  RAG, with respect to this requirement, merely alleges "Clemmer, Debtors and Quad all used the trade secret information to the detriment of Riverside, causing damages to Plaintiff."[316]

In *Diversified Industries, Inc.*, the court faced a similarly pled claim for common law misappropriation of a trade secret under the Trade Secret Act, which as described above, requires many of the same elements.[317]  There, the movant, with respect to the alleged detriment it suffered, merely asserted "Vinyl Trends has suffered actual losses as a direct

---

[313] *Trading Partners Collaboration, LLC v. Kantor*, 09-0823, 2009 WL 1653130, *8 (D.N.J. 2009) (citation omitted).

[314] *Id.* (citation omitted).

[315] *See, e.g.*, Proposed Amended Complaint at ¶ 19.

[316] *Id.* at ¶ 164.

[317] *Diversified Industries, Inc.*, 2014 WL 1767471, at *8.

consequence of Diversified Industries' conduct . . . ."[318]  The court found this insufficient as this statement "consist[s] of a bare recitation of the elements required under the Act."[319]

RAG's statement is similarly conclusory.  Nowhere in the proposed Amended Complaint does RAG allege more facts as to what damages or detriments it suffered.  As such, this claim is insufficiently pled as to Debtors/Defendants and as to Quad.  Moreover, it is insufficiently pled as to Quad for another reason.  The court in *Mu Sigma I* held, that "misappropriation by plaintiff's employees, which took place before the defendants' incorporation, was 'irrelevant to a claim of misappropriation of trade secrets against Defendants."[320]  This reasoning might be applicable with respect to Quad.  Although Quad was likely incorporated at the time of the alleged wrongdoing, Quad did not purchase the assets until 2013, and as such the actions of the employees should be "irrelevant to a claim of misappropriation of trade secrets against [Quad]."

Thus, allowing assertion of a claim for misappropriation of trade secrets would be futile as to all Defendants as RAG failed to plead sufficient facts as to what damages it suffered.

    *(xi)    XVII (Common Law Misappropriation of Confidential and Proprietary Information)*

Here, RAG merely pled, "Clemmer, Debtors or Quad all used the Confidential and Proprietary information to Plaintiff's detriment, causing damages to Plaintiff."[321]  The

---

[318] *Id*.

[319] *Id*.

[320] Quad's Opposition at 28 (citing *Mu Sigma I*).

[321] Proposed Amended Complaint at ¶ 170.

proposed Amended Complaint as a whole, however, is devoid of any facts as to what damages or detriment RAG suffered.  As such, the claim is not properly pled and allowing its assertion would be futile.

## V.      Conclusion

While courts are liberal in allowing amendments to complaints, there are exceptions.  Factors the courts consider in deciding whether amendments should not be allowed are when doing so would unfairly prejudice defendants, the amendment is after an undue delay, plaintiff is acting in bad faith and/or allowing amendment would be futile.  In this case, allowing RAG to assert the claims in the Amended Complaint against the Defendants would unfairly prejudice Defendants, the claims have been brought after undue delay and Plaintiff is acting in bad faith.  Moreover, all of the claims (with two exceptions against the Debtors/Defendants)[322] that Plaintiff seeks leave to assert would not survive a motion to dismiss and, thus, allowing their assertion would be futile.[323] Thus, the Court will deny the Motion to Amend.

### Defendants' Motions for Summary Judgment

The Debtor/Defendants and Quad have filed separate motions for summary judgment.  In both cases Defendants seek summary judgment on all six counts of the Complaint:  (1) Declaratory Judgment (Count I); (2) Conversion (Count II); (3) Common

---

[322] Proposed Counts XIII and XV.

[323] For those claims that are not futile the Motion to Amend can nonetheless be denied on the bases of unfair prejudice, undue delay and Plaintiff's bad faith discussed above.

Law Aiding and Abetting of Conversion (Count III); (4) Replevin (Count IV); (5) Unjust Enrichment (Count V); and (6) Accounting (Claim VI).

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, mandates that summary judgment should be granted when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter if law."[324]  After an adequate time for discovery, Federal Rule of Civil Procedure 56(c) "mandates judgment against the party who 'fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"[325]

Initially, "the burden of showing that no genuine issue of material fact exists rests . . . on the moving party."[326]  The moving party may discharge this burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case."[327]

The moving party must "put the ball in play, averring an absence of evidence to support the nonmoving party's case."[328]  The burden then shifts to the nonmoving party

---

[324] Fed.R.Civ.P. 56.

[325] *Brockstedt v. Sussex Cnty. Council*, 794 F. Supp. 2d 489, 498 (D. Del. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[326] *Wilson v. Mt. Tee's*, 855 F.Supp. 679, 681 (D.N.J. 1994) (quoting *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed. 748 (1977).

[327] *Id.* at 681 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L.Ed 2d 265 (1986)).

[328] *Celotex Corp.*, 477 U.S. at 325.

who has to "set forth specific facts showing that there is a genuine issue for trial."[329]

"There is no issue for trial unless the nonmoving party can demonstrate that there is sufficient evidence favoring the nonmoving party so that a reasonable jury could return a verdict in that party's favor."[330]  The nonmoving party must show more than a "mere existence of a scintilla of evidence"[331] as "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."[332]  The nonmoving party "must point to actual evidence in the record on which a jury could decide an issue of fact its way."[333]

Summary judgment is designed "to avoid trial or extensive discovery if facts are settled and [the] dispute turns on [an] issue of law."[334]  "In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the nonmoving party."[335]  The court's role at this stage in the litigation is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."[336]

---

[329] *Wilson v. Tee*, 855 F.Supp. at 681 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48; *see also Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir. 1991), *cert. denied*, 504 U.S. 985 (1992)).

[330] *Id.* (citation omitted).

[331] *Anderson v. Liberty Lobby, Inc.*, 477 US. 242, 252 (1986).

[332] *Elmer v. Tenneco Resins, Inc.*, 698 F. Supp. 535, 538 (D. Del. 1988) (citing *Anderson*, 477 U.S. at 247-48.).

[333] *El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007).

[334] 11-56 MOORE'S FEDERAL PRACTICE, § 56.02 (Matthew Bender 3d ed.)

[335] *Wilson*, 55 F. Supp. at 681 (citation omitted).

[336] *Id.* (citing *Anderson*, 477 U.S. at 249).

I.      **Successor Liability with Respect to Quad**

RAG, in its opposition to the motions for summary judgment, for the first time in this adversary proceeding, asserts that "Quad has successor liability for the alleged **tortious conduct** based upon the fact that the transaction between Quad and Vertis amounted to a consolidation or merger; Quad is a continuation of Vertis; and Quad undertook to do essentially the same activities Vertis performed."[337]  RAG further, citing to the hearing transcript of the Sale Hearing held before this Court on December 6, 2012, asserts "Quad cannot escape successor liability since Riverside's Confidential Information and Intellectual Property **were not part of the Acquired Assets.**"[338]

RAG's late assertion of this argument is problematic for a number of reasons. RAG does not address the Sale Order, which contains applicable provisions as to the issue of successor liability.  Furthermore, after RAG asserts that "successor liability exists," it delves right into an in-depth discussion of New Jersey state law completely ignoring applicable Third Circuit case law addressing successor liability in connection with bankruptcy law and 363 asset sales.  Finally, the argument is made solely in the briefs and RAG does not actually assert successor liability in the Complaint.

**A.  The December 6, 2012 Hearing Transcript**

RAG, relying on certain statements the Court made during the December 6, 2012 Sale Hearing, asserts that "Quad cannot escape successor liability since Riverside's Confidential Information and Intellectual Property **were not part of the Acquired Assets**

---

[337] RAG's Opposition to Summary Judgment at 60.

[338] *Id.* at 61.

(as that term is defined in the Sale Order)."[339]  Quad vehemently rejects RAG's attempt

to "misconstrue[] the Court's remarks during the sale hearing . . . to assert that Quad can

be subject to successor liability."[340]

What follows is an excerpt from the hearing transcript containing the statements

at issue.

> MS. DARBY:  . . . I think the initial threshold issue that needs to be decided
> before this goes any further is whether or not Riverside's property is indeed
> property of the estate.
>
> THE COURT:  It doesn't. It doesn't need to be decided. Because if it's not
> property of the estate, they can't sell it. If it's property of the estate they can
> sell it, okay. If it's not property of the estate, you have damages claims
> against whoever **uses** something that belongs to you, whether it be the
> debtor or Quad. If it is property of the estate, I'm sorry, but too bad, you
> don't have a property ownership interest in it, and they can sell it because
> it's an asset free and clear, so it doesn't matter one way or the other. **I don't
> have to decide who owns it.**
>
> THE COURT: At all. Only when you have to decide who owns it if Quad
> purports to somehow be able under this sale order to use property that
> doesn't belong to the debtor and be insulated from damages, that's the only
> reason that I think I would have to decide it.

Later, Ms. Darby returned to the issue of ownership.

> MS. DARBY: Your Honor, just a couple of points, . . . .
> But to one point that Mr. Madron just made.  It is to say that an injunction
> was not granted because to say, and this is a sale of substantially all includes
> Riverside's assets one thing of a use, Riverside's concern, to allow the assets,
> which ostensively free and clear of everything.  it is another thing.
>
> THE COURT: You're not listening, okay. They can't sell it free and clear if
> they don't own it. If they own it, they can sell it free and clear. Okay. **So the
> issue of ownership in no way impacts the free and clear issue.** If they don't
> own it, they purport to sell it, Quad **uses** it, and (indiscernible) against

---

[339]  RAG's Opposition to Summary Judgment at 61.

[340]  Quad's Reply at 9.

Quad. Okay. It's you don't know it, and the debtor sales it, and Quad **uses** it, you don't have damages against Quad, it's that simple . . . . [341]

The Court overruled RAG's objection, again emphasizing that Quad, in the event the property at issue is not part of the estate, might be subject to liability for **using** the property.

So the objection is overruled. The rights of the parties in connection with the underlying litigation are preserved. To the extent Quad is ultimately it turns out it's **using** (indiscernible) it's not entitled to (indiscernible), they may be subject to certain claims, **I'm not going to decide that as I sit here today . . . .**[342]

The Court: So the problem I take it is that you claim that you own the property, and Quad is going to buy what purports to be the debtor's property, and ultimately some court is going to decide that it, in fact, was not property of the estate and belongs to you, and as a result of course, Quad couldn't buy it.

You would then have a continuing claim against the debtor for whatever damage the debtor had prior to selling it, and you would then have a claim against Quad for damages, et cetera from being in **possession** of your property on a **post sale** basis. So I think where the rubber hits the road on this issue would be whether Quad can somehow buy your property free and clear of liens or they can't, because it's yours. However, if they purport to **use it on a post petition basis**, they would have -- you will have been -- you would incur damages and you would be able to assert them against Quad.[343]

Again, RAG simply asserts "Quad cannot escape successor liability since Riverside's Confidential Information and Intellectual Property were not part of the Acquired Assets (as that term is defined in the Sale Order)." Quad argues that the Court's comments during that hearing meant, that "any claims asserted against Quad could only

---

[341] Hearing Transcript (D.I. 436) at 55-56.

[342] *Id*. at 63.

[343] *Id*. at 45.

be asserted, if at all, with respect to any unauthorized *use* of RAG's property by Quad on a *post-sale* basis, consistent with the Court's ruling in the Sale Order."[344]

Quad is correct. The hearing transcript clearly evidences that the Court did not decide "the ownership issue." However, even assuming the property at issue was not part of the acquired assets, the Court's statements made at the Sale Hearing do not indicate that Quad should be subject to successor liability. The Court repeatedly stated, that "you would then have a claim against Quad for damages, et cetera from being in **possession** of your property on a **post sale** basis." There are no indications that the Court meant to impose successor liability for the alleged tortious conduct of the Debtors prior to the asset sale.

### B. The Asset Purchase Agreement and the Sale Order with Respect to Successor Liability

Moreover, RAG ignores the applicable provisions of the Asset Purchase Agreement and the Sale Order. With respect to "successor liability," the Asset Purchase Agreement between Vertis and Quad provides:

> **No Successor Liability**: The Parties intend that, except where expressly prohibited under applicable Law, upon Closing, Buyer shall not be deemed to: (i) be the successor of any Seller, (ii) have, de facto, or otherwise, merged with or into any Seller, (iii) be a mere continuation or substantial continuation of any Seller or the enterprise(s) of any Seller, or (iv) be liable for any acts or omissions of any Seller in the conduct of the Business or arising under or related to the Acquired Assets other than set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that Buyer shall not be liable for any bankruptcy claims, other claims, written notices, causes of action or Litigation against any Seller or any of any Seller's predecessors or affiliates, and Buyer shall have no successor or vicarious liability of any

---

[344] Quad's Reply at 10.

kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Acquired Assets, the Excluded Assets or the Excluded Liabilities or any other obligations of Sellers . . . . [345]

On December 6, 2012, after the Sale Hearing, the Court entered an order which "authorized and approved the Debtors' sale of substantially all of their assets 'free and clear of all liens, claims, encumbrances and other interests' to Quad pursuant to the terms of the Asset Purchase Agreement and its related amendments, and without any liability to Quad on account of any successor or transferee liability of the Acquired Assets or the Business or the operation of the Acquired Assets or the Business prior to and including the Closing Date, in each case as defined and provided for in the Asset Purchase Agreement (the "Sale Order")."[346]

In pertinent parts, the Sale Order provides:

[Quad] is not a mere continuation of the Debtors or their estates, there is no continuity or common identity between [Quad] and any of the Debtors, and there is no continuity of enterprise between [Quad] and any of the Debtors. [Quad] is not holding itself out to the public as a continuation of any of the Debtors. [Quad] is not a successor to any of the Debtors or their estates and the Sale does not amount to a consolidation of merger, or de facto merger of [Quad] with or into any of the Debtors.

With respect to the Acquired Assets, the Sale Order, in pertinent part, provides:

[T]he Acquired Assets shall be sold free and clear of all interests, obligations, rights, encumbrances, pledges, liens . . . , liabilities, . . . judgments, . . . debts, rights of recovery, . . . restrictions, . . . labor and employment rights and claims, . . . claims based on . . . products liability, tortious conduct, property damage, . . . acts, or failures to act, . . . in each case, of whatever kind, nature, or description in, against or with respect to any of the Acquired Assets, the Debtors, or the Business having arisen,

---

[345] Sullivan Decl. Ex. G [Asset Purchase Agreement] at Section 9(d).

[346] Quad's Reply at 4-5.

existed, or accrued prior to and through the Closing Date, . . . including claims or liabilities otherwise arising under doctrines of successor liability, de facto merger or substantial continuity or liabilities or obligations arising under any Law or Decree . . . .[347]

At yet another part of the Sale Order, it states:

[Quad] shall not be liable for any Interests, claims or liabilities against the Debtors or any of its predecessors or affiliates, and [Quad] shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, . . . products liability, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of and including the Closing Date, now existing or hereinafter arising, whether asserted or unasserted, fixed or contingent, . . . with respect to the Debtors or any obligations of the Debtors arising prior to and including the Closing Date . . . .[348]

    Upon the Closing Date . . . , all persons or entities are hereby forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial , administrative, arbitral, or other proceeding against [Quad], its successor or assigns, or the Acquired Assets, with respect to any (i) Interest arising under, out of, in connection with or in any way relating to the Debtors, [Quad], the Acquired Assets, the Business or the operation of the Acquired Assets or the Business prior to and including the Closing Closing Date or (ii) successor or transferee liability, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding against [Quad], its successors or assigns, assets, or properties, . . . or (e) commencing or continuing any action, in any manner or place, that does not comply r is inconsistent with the provisions of this Order or other orders of this Court . . . .[349]

RAG, not once, acknowledges these pertinent provisions.  It merely, relying on New Jersey state law, asserts, among other things, that  "[i]n New Jersey, successor liability is established if the successor purchaser continued with the predecessor's

---

[347] *Id*. at 11-13.

[348] *Id*. at 26-27.

[349] *Id*. at 28-29 (emphasis added).

product line and derived a benefit therefrom."[350]  This is insufficient.  Moreover, RAG

did not appeal the Sale Order, which now constitutes a Final Order of this Court no longer

subject to appeal.[351]

### C.  Governing Third Circuit Law Regarding Successor Liability

RAG also ignores Third Circuit law with respect to successor liability.  In *In re Trans*

*World Airlines, Inc.*, the Third Circuit held that "[t]o allow claimants to assert successor

liability claims against [the purchaser] while limiting other creditors' recourse to the

proceeds of the asset sale would be inconsistent with the Bankruptcy Code's priority

scheme."[352]  In a more recent case, Judge Walrath confirmed the *TWA* holding in *In re*

*Ormet Corp.*[353]  Judge Walrath stated that  "[i]t is the express provision of section 363(f)

which allow the sale of the Debtors' assets free and clear of any claims, including

successor liability claims as the Third Circuit specifically held in *TWA*."[354]

### D.  RAG "Pled" Its Claim for Successor Liability in Its Opposition to Defendants' Motions for Summary Judgment

RAG's assertion of Quad's successor liability appears only in Plaintiff's brief.  The

Complaint is devoid of any claim for successor liability against Quad.  In fact, RAG's

---

[350]  RAG's Opposition to Summary Judgment at 60 (quoting *Saez v. Corrugated Paper Machinery Co., Inc.*, 302 N.J. Super. 545 (App. Div. 1977).

[351]  RAG's Reply at 13.

[352]  322 F.3d 283, 292 (3d. Cir. 2003).

[353]  No. 13-10334, 2014 WL 3542133, at *4 (Bankr. D. Del. July 17, 2014).

[354]  *Id.* at *4.

complaint merely asserts liability against Quad "should it come into possession" of RAG's property.[355]

Quad argues, "RAG cannot now assert in opposition to summary judgment a novel claim for successor liability . . . it did not plead in its Complaint."[356]  In addition, Quad contends that the Complaint does not contain any facts "to support its novel argument that Quad has successor liability."[357]

Courts have repeatedly rejected plaintiffs' successor liability claims in cases in which plaintiffs raised the theory in a brief rather than in a complaint.  For instance in *Network Enters., Inc. v. APBA Offshore Prods., Inc.*, the plaintiff, for the first time in a brief, "alleged" successor liability.[358]  The court held that an "argument in a brief is not the equivalent of a pleading. The imposition of successor liability, as with corporate veil-piercing, requires the allegation and proof of specific facts, none of which have been alleged in the proposed Amended Complaint."[359]

* * *

Pursuant to the Sale Order, applicable Third Circuit case law, and the Court's statements made during the Sale Hearing, it is clear that RAG's assertion that there is successor liability as to Quad for the alleged tortious acts of the Debtors that occurred prior to the asset sale is without merit.  Moreover, there is no apparent reason why RAG

---

[355] *See* RAG's Verified Complaint (D.I. 1) ("Complaint") at ¶¶ 39, 41, 54, 62.

[356] Quad's Reply at 15.

[357] *Id.* at 17.

[358] No. 01 Civ. 11765, 2002 WL 31050846, at *7 (S.D.N.Y. Sept. 12, 2002).

[359] *Id.* at *6.

did not plead a claim for successor liability in its Complaint. Thus, the Court finds that RAG did not properly plead a claim for successor liability.

## II.    RAG's Common Law Conversion Claim (Count II)

Plaintiff alleges that Defendants "have improperly and unlawfully exercised dominion and control over some or all of the Confidential Information and Intellectual Property . . . [and] have converted [it]."[360] Defendants disagree arguing that Plaintiff's claim is "legally and factually insufficient" for the following reasons (1) Plaintiff's entire case is "premised on the alleged-copying of intangible computer data," which cannot form the basis of a conversion claim under New Jersey law, and (2) even assuming it is premised on tangible property, it would still fail because RAG is still in possession of its property.[361]

Plaintiff responds claiming that Defendants "erroneously contend that Riverside is solely claiming that intangible property was converted."[362] RAG states that it alleges in part that its claim is based on the conversion of "customer lists, customers' ordering habits, merchandising plans, projections, product strategies, pricing methods and mark up structures."[363]

---

[360] Complaint at ¶¶41, 42

[361] Debtor/Defendants Memorandum in Support of Summary Judgment at 31. Defendants also argue that Plaintiff's state law claims are preempted by federal copyright law. Because the Court finds Plaintiff's claims deficient under state law it need not address the preemption issue.

[362] RAG's Opposition to Summary Judgment at 67.

[363] Complaint at ¶24.

Under New Jersey law, a plaintiff in order to succeed on a conversion claim must prove the following: "(1) Defendants wrongfully exercised dominion or control over **Plaintiff's property**; (2) the property was taken without authorization; and (3) the property was taken **to the exclusion of the owner's rights** to it."[364]

### A. The Nature of the Property at Issue

New Jersey courts have repeatedly held that one cannot convert intangible property.[365]   Furthermore, with respect to certain proprietary information, New Jersey courts also repeatedly held that tangible property such as customer lists are not considered "tangible" for purposes of conversion. [366]   For instance, in *Mu Sigma I*, plaintiffs alleged, among other things, that defendants converted plaintiff's confidential and proprietary information, including client lists and pricing information.[367]   The court stated:

> Plaintiff has not specified any tangible property over which Defendants exercised wrongful control.  While Plaintiff alleges that Defendants are in possession of its client lists, pricing information and the like, these are not considered tangible objects for the purposes of conversion.[368]

---

[364] Debtor/Defendants Memorandum in Support of Summary Judgment at 35 (citing *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 7070, 753 (D.N.J. 2013)).

[365] *See, e.g., Cameco, Inc. v. Gedicke*, 299 N.J. Super. 203, 217 (N.J. Super. Ct. App. Div. 1997); *see also StrikeForce Techs., Inc. v. WhiteSky, Inc.*, 2013 WL 3508835, *8 (D.N.J. 2013).

[366] *Id.*

[367] *Mu Sigma I*, at *11.

[368] *Id.* (citation omitted).

Therefore, RAG's argument that its claim is based in part on tangible property, *i.e.*, "customer lists, customers' ordering habits, merchandising plans, projections, product strategies, pricing methods and mark up structures," must fail as a matter of law.

In addition, there is ample evidence that Defendants sent this "tangible property" via email, thus as a "soft copy" in electronic format.  For instance, Ms. Oh admitted that she recognized from emails Mr. Acerbo sent to Mr. Clemmer, that he attached certain recapping invoices he received during the course of his employment with Com-Pak, and that certain customer information and ordering habits were disclosed.  Therefore, as in *Mu Sigma I*, this Court finds that the items listed as "tangible" are not tangible for the purposes of conversion.

However, the Court's inquiry does not end here.  Plaintiff, in its opposition to Defendants' summary judgment motions, additionally argues that the following would "establish that a genuine issue of material fact exists as to the nature of the property possessed and subsequently used by Debtors/Defendants."[369]

- Mr. McDonald specifically described some of these hard copy materials to be, '. . . co-mingle presentations.  There were one-price matrices were developed on Excel.  There were freight analysis by carrier, there were RFPs where the information was being – we were in the process of working on those RFPS.'[370]

- The fact that Mr. McDonald stated that all materials were kept in hard and soft copy.[371]

---

[369] *Id*. at 70.

[370] Sullivan Decl. Ex. D (McDonald Depo.) at 92:25-93:6.

[371] Sullivan Decl. Ex. D (McDonald Depo.) at 92:25-93:6.

**PLEASE NOTE: RAG cites to Meola Decl. Ex. W at 93:9-14, but did not include the proper pages. This happened more than once in this case.**

- The fact that "Ms. Pizzutillo admits she readied a postal card, a tangible item, for permits with the United States Post office . . . " for 5 Digit and Clemmer while employed by RAG." [372]

- Testimony from Mr. Guyon who had "observed in Mr. Acerbo's office the hard drive which he had utilized to transfer files, documents and software from Com-Pak Services, Inc. and/or Riverside."[373]

None of these facts establish more than a "scintilla" of evidence. There is ample evidence in support of Defendants' argument that the property is intangible in nature and, thus, cannot form the basis of a conversion claim under New Jersey law.

- RAG's counsel made the following statement to this Court:

Our response to their interrogatories, our responses to their request for production, all indicate and disclose specific pieces of **software**, specific pieces of information that we allege were taken. So, in terms of Mr. Stewart's comments that we don't know what the 'items' that have been misappropriated are, I disagree.[374]

The **home grown software** is the key to this case . . . . We are talking about **modifications in derivative works**[375] to **software methods and processes** that were owned originally by Riverside and that were taken from them and **implemented** in the 5 Digit process . . . It's the bucket that Mr. Sullivan described as the home grown software, that's **the special sauce** in this case.[376]

- The following testimony of RAG's Corporate Representative:

Q. Okay. My understanding of RAG's allegations in this lawsuit is that one or more individuals        copied   confidential   information   and/or intellectual property from RAG's computers and provided    that copy to a competitor. Is that accurate?

A. Yes.

---

[372] Meola Decl. Ex. B (Pizzutillo, January 31, 2014, Depo.) at 364-65, 371-74.

[373] Meola Decl. Ex. E  (Certification of Edward Guyon)¶¶26, 27.

[374] Debtor/Defendants' Reply at 15 (citing Meola Decl., at 14:23-15:4).

[375] This is a term used in copyright law.

[376] Debtor/Defendants' Memorandum in Support of Summary Judgment Exh. 36 (Hearing Transcript) at 13:3-22.

Q. I just want to make sure we're clear because I think earlier we talked about how **we're talking about copies of electronic information**. So I just want to make sure **there was not one hard copy customer list** that was kept in a vault somewhere. That's not what we are talking about, right?

A. Not to the best of my knowledge.

Q. Okay. Nothing like that – that was only kept in hard copy form – that has gone missing?

A. I believe that **probably everything exists in soft copy somewhere**.

- Acerbo admitted that he sent home an email attaching the "Updated Commingling postage costs" document of RAG to his personal email account,[377] which he, after his termination from RAG, did not return;[378]

- Mr. Guyon set up FTP sites for Com-Pak Services employees to transfer files from Com-Pak into the FTP servers; to provide access to software and processes from Com-Pak;[379]

- Ms. Oh testified that she observed emails Mr. Acerbo sent to Clemmer disclosing non-public customer information of Com-Pak;[380]

- There is further testimony that certain financial **documents** on 5 Digit **servers** were exactly the same **documents** that were used at RAG.[381]

In addition, how does a postal card, Ms. Pizzutillo readied on behalf of 5 Digit during her employment at RAG, become tangible property of RAG?  Because Ms. Pizzutilli worked at RAG while she obtained the card?  This is insufficient evidence.

---

[377] Meola Decl. Ex. I (Acerbo Depo.) at 42:16-43:18.

**[378]** Meola Decl. Ex. I (Acerbo Depo.) at 48:8-10.

[379] Meola Decl. Ex. E (Certification of Edward Guyon) at ¶22.

[380] Meola Decl. at Ex. K (Oh Depo.) at 261:8-18; 262:1-22.

[381] Meola Decl. Ex. L (Guyon Depo.) at 117:7-118:1-14.

RAG also mentioned hard copies of "one-price matrices developed on Excel . . . [and] freight analysis by carrier."  These are not tangible for purposes of conversion similar to customer lists and other proprietary information as described above.  The reference to "documents" also constitutes, if at all, a mere scintilla of evidence.  With respect to these "documents" discovery revealed that they were sent via email, as such in electronic form.  For example, Mr. Guyon certified that he "was requested by Vincent Acerbo to advise the best type of external hard drive for him to utilize in order for him to personally transfer files, **documents** and software from Com-Pak Services, Inc. and Riverside Acquisition Group LLC onto. I recommended an external hard drive manufactured by Western Digital."[382]

The record is devoid of any evidence beyond a mere "scintilla" that any of the Defendants took physical, tangible items that would constitute tangible property for purposes of conversion.  Thus, there is no genuine issue of material fact with regard to the nature of the property.  The record contains sufficient evidence for a "reasonable jury [or a judge in a bench trial] to find in Plaintiff's favor after trial."

**B.  Does RAG Own the Property at Issue?**

Defendants argue that RAG's conversion claim must also fail because "as confirmed through the course of discovery, RAG does not actually own much of what it purports to own in the way of certain software and other related intangible property supposedly at issue."[383]

---

[382]  Meola Decl. Ex. E (Certification of Edward Guyon) at ¶26.

[383]  Quad's Memorandum in Support of Summary Judgment at 42.

The Court agrees and disagrees. The record contains sufficient evidence establishing that most of the software at issue is not RAG's property. In fact, RAG has admitted that it licensed most of the software from third parties such as Pitney Bowes. However, the record contains sufficient evidence showing RAG's ownership of certain proprietary information, such as customer lists, pricing lists and other proprietary information. The record also contains sufficient facts to establish RAG's ownership of the Charlie's Programs. Mr. Saccarelli wrote these programs for Com-Pak while employed at or while he provided consulting services for Com-Pak.

Thus, RAG has met its burden with regard to the ownership of the Charlie's Programs and certain proprietary information such as customer lists (nonetheless, as stated above, this property is not tangible).

### C. Is RAG Still in Possession of the Property at Issue?

In order to succeed on a conversion claim, however, a plaintiff must further prove that the property was taken to the exclusion of the owner's rights to it.[384] Defendants assert that RAG was never deprived of any of its property. Defendants rely on the following:[385]

> Q. The intellectual property that you claim was taken, is any of that unavailable to you today to use?
>
> A. No
>
> Q. So you're actually continuing to use that intellectual property, correct?
>
> A. That is correct.

---

[384] *See Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 753 (D.N.J. 2013).

[385] Sullivan Decl. Ex. D (Deposition of Robert McDonald, Oct. 3, 2013, 220:25-221:3; 220:18-24, 248:11-15).

Q. The confidential information, was any of that taken in such a way that it's not available to you to use?

A. No, it's certainly available to us.[386]

RAG, in its opposition, for the first time, shifts the focus to some allegedly not returned "documents" on Mr. Acerbo's hard drive to argue that RAG is deprived of at least some of its property.[387]  RAG states "Riverside's use or possession of some of the property does not bar its conversion and replevin claims."[388]  To support its claim, it relies on a certification of Mr. Guyon in which he certified that he observed the hard drive Mr. Acerbo used to transfer property.[389]

Defendants, accuse RAG of "blatantly ignoring [Guyon's] deposition," during which he admitted, he never looked on the external hard drive.[390]

The Court agrees with Defendants.  Guyon's admission that he, in fact, never looked at the hard drive defeats RAG's argument that it is deprived of at least some allegedly not returned property.

### D. Quad's Use of RAG's Intellectual Property and Confidential Information

*"Judges are not like pigs, hunting for truffles buried in briefs."*[391]

In its Complaint, RAG alleges:

Debtors and **Quad, should it come into possession of the Confidential Information and Intellectual Property by virtue of the proposed sale**,

---

[386] Sullivan Decl. Ex. D (Deposition of Robert McDonald, Oct. 3, 2013, 220:18-221:3).

[387] RAG's Oppositon at 71.

[388] RAG's Opposition at 71.

[389] Meola Decl. Ex. E (Certification of Edward Guyon) at ¶ 26.

[390] Debtor/Defendants' Reply at Exh. 49 (Guyon Depo.) at 154: 6-20, 154:8-13.

[391] Debtor/Defendants' Reply at 1 (citing *Boomer v. Lewis*, 541 Fed. Appx. 186, 191 (3d Cir. 2013) (quoting *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

have improperly and unlawfully exercised dominion and control over some or all . . . [of the property].[392]

Debtors **and Quad have converted** some or all of the Confidential Information and Intellectual Property and are liable to Plaintiff for damages for such wrongful acts in an amount to be determined at trial.[393]

In its opposition brief, RAG does not point this Court to any evidence as to Quad's possession and/or use of its property. In fact, RAG merely addresses that "there is a genuine issue of material fact that Debtor/Defendants are liable for conversion and replevin . . . "[394] and that "Debtor/Defendants possessed and used" RAG's property.[395] RAG does not mention Quad in its discussion.

With respect to Quad's alleged possession and use of RAG's Intellectual Property and Confidential Information, the record contained the following:

- Quad did not receive Charlie's Programs as a result of its purchase of all of Debtors assets.[396]

---

[392] Complaint at ¶41.

[393] Complaint at ¶42.

[394] RAG's Opposition at 65.

[395] *Id.* at 67.

[396] Sullivan Decl. Ex. BB (Arias Depo. at 102:4-20, 103:22-107:24, 169:15-171:4, 188:23-189:19, 191:13-192:14, 224:19-227:4); Sullivan Decl. Ex LL [Arias Depo. Ex. CA-4]; Sullivan Decl. Ex. KK [Arias Dep. Ex. CA-5] at 6-7.

- Quad also licensed Group 1 Software prior to the purchase of Debtors' assets.[397] After it acquired the assets, it did not renew 5 Digit's license; it instead continued with its original license.[398]

- 5 Digit separately purchased and operated Pitney Bowes sorters, but different models than Com-Pak.  Quad, as a result of the purchase of substantially all of the Debtors' assets, operates the Pitney Bowe sorters 5 Digit previously operated.[399]

Quad is simply not in possession of RAG's property, intangible or not.

The property at issue is not tangible and, thus not subject to conversion.  Moreover, while RAG owns certain of the subject property, RAG was never deprived of the property.  The elements of conversion are simply not met.  Based on the foregoing, the Court will grant both motions for summary judgment with respect to Count II for conversion.

## III.    Aiding and Abetting Conversion (Count III)

Plaintiff argues that "the evidence demonstrates that Debtor was (i) aware of its role in an overall tortious activity when it provided assistance to Clemmer and the Team members in the establishment of 5 Digit Plus and (ii) Debtor knowingly and substantially assisted in the conversion of Riverside's property."[400]

---

[397]  Sullivan Decl. Exh. BB (Deposition of Carlos Arias, testifying on behalf of Quad pursuant to Fed. R. Civ. P. 30(b)(6), Apr. 28, 2014, 116:12-117:10, 145:10-24) ("Arias Depo.").

[398]  Sullivan Decl. Exh. BB (Arias Depo.) at 116:12-117:10, 145:10-24; Sullivan Decl. Ex. L (Deposition of Donald S. Terkel, Feb. 4, 2014, 137:2-8) ("Terkel Depo"); Sullivan Decl. Ex. CC (Pizzutillo, Jan. 31, 2014, Depo.) at 73:17-25.

[399]  Quad's Memorandum in Support of Summary Judgment at 17 Sullivan Decl. Ex. Y (Wuman Depo.).

[400]  RAG's Opposition at 74.

As discussed above, RAG's conversion claim cannot survive summary judgment. As one cannot be guilty of aiding and abetting a claim that doesn't exist the Court will grant Defendants' motions for summary judgment on Court III for aiding and abetting conversion.

## IV.  Replevin (Count IV)

Under New Jersey law, in order to succeed on a replevin claim, a plaintiff must demonstrate that it seeks the "recovery of *goods*."[401]  The Court's discussion as to the nature of the property in this case equally applies here, i.e., the property cannot constitute a "good."  Thus, this claim cannot survive summary judgment.   The Court will grant Defendants' motions for summary judgment on Count IV for replevin.

## V.    Unjust Enrichment and Imposition of Resulting or Constructive Trust (Count V)

"New Jersey does not recognize unjust enrichment as an independent tort cause of action."[402]  Defendants argue that RAG's unjust enrichment claim relies on the same facts as its other tort claims and that it fails to allege certain requirements for an unjust enrichment claim.  As such, Defendants assert that RAG's unjust enrichment claim is nothing more than "a repackaged tort as unjust enrichment," and as such should be dismissed.[403]

---

[401]  Pursuant to N.J.S.A. 2B:50-1, "a person seeking recovery of goods wrongly held by another may bring an action for replevin . . . If the person establishes the cause of action, the court shall enter an order granting possession."

[402]  *See, e.g.*, *Castro v. NYT Television*, 851 A.2d 88, 98 (N.J. App. Div. 2004)); *see also Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 754-55 (D.N.J. 2013).

[403]  Debtor/Defendants' Reply at 25.

In *Jurista*, the court dismissed an unjust enrichment claim where the plaintiff brought several other tort claims based on the same facts holding that "[w]here a plaintiff asserts an unjust enrichment cause of action along with [other] tort claims and there appear to be no allegations that the plaintiff expected or anticipated remuneration from the defendant, the unjust enrichment claim should be dismissed."[404]

RAG alleges the following:

As a result of Debtors' and/or Quad's failure to return the Confidential Information and Intellectual Property despite Plaintiff's demand and the New Jersey Litigation, Debtors and/or Quad have enjoyed and/or will enjoy the use and benefit of the Confidential Information and Intellectual Property and the proceeds derived by each of them therefrom.

Debtors and/or Quad continue or will have the use and benefit of the Confidential Information and Intellectual Property and the proceeds derived by each of them therefrom.

Under the circumstances, it would be inequitable for Debtors and/or Quad to retain the benefit of the Confidential Information and Intellectual Property (and the proceeds therefrom) in its possession.

Plaintiff is entitled to the imposition of a resulting or constructive trust on the Confidential Information and Intellectual Property in Debtors' and/or Quad's possession and the proceeds derived therefrom in favor of Plaintiff, which holds all right, title and interest thereto.

As in *Jurista*, RAG's complaint is devoid of any information as to an expected remuneration.  Since RAG asserts this claim along other tort claims, the Court will grant Defendants' motions for summary judgment on Court V for unjust enrichment.

---

[404] *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 754-55 (D.N.J. 2013).

## VI.  Declaratory Judgment Claim (Count I)

Debtor/Defendants argue that this claim is moot, as "there is absolutely no evidence that Defendants are in possession of anything that arguably belonged to RAG, because Defendants sold its relevant assets to Quad pursuant to this Court's order."[405] Quad similarly argues "RAG can point to no evidence that Quad ever possessed or used any of RAG's alleged property, and that RAG has conceded that RAG itself does not even own much of the alleged property supposedly at issue.[406]

RAG, invoking Fed. R. Civ. P. 8(a)(2), argues it has sufficiently alleged facts that are the bases for many other claims, including Trespass to Chattels; violations under the New Jersey Computer Related Offenses Act and others.[407]

Defendants take further issue with accusing RAG for seeking "to 'back door' what appear to be at least eight new causes of action by claiming they were all along, but just under the guise of RAG's declaratory judgment claim."[408]  Debtor Defendants call this behavior "an audacious combination of Monday-morning-quarterbacking and wishful thinking."[409]

RAG's claim for a declaratory judgment is moot.  As explained in detail in connection with the conversion claim, RAG failed to provide sufficient facts beyond a mere scintilla as to Quad's possession/use of RAG's property.  With respect to

---

[405]  Debtor/Defendant's Reply at 33.

[406]  Quad's Reply at 35.

[407]  RAG's Opposition at 86.

[408]  Quad's Reply at 36.

[409]  Debtor/Defendants' Reply 33.

Debtor/Defendants, RAG has failed to raise a genuine issue of material fact with respect to whether Debtor/Defendants remain in possession of any of RAG's property after the sale of its assets to Quad. Thus, the Court will grant Defendants' motions for summary judgment on Count I for declaratory judgment.

## VII. Accounting (Count VI)

Under New Jersey law, "the party seeking to obtain an accounting must establish: (1) a fiduciary or trust relationship; (2) the complicated [complex] nature of the character of the account; and (3) the need of discovery."[410]  A matter is complex if

> [T]he issues necessary to be determined, in order to arrive at a just conclusion, are so numerous, and dependent upon such a variety of evidence, or of evidence of such a technical character, as that is substantially impossible for a jury, retiring in the ordinary way to a jury room and obliged to carry all of the oral evidence in their memories, to come, at one session, to anything like just and proper conclusion.[411]

RAG argues that this matter is complex and that more discovery is needed to "determine the magnitude of the harm imparted on it by Debtor/Defendant and Quad." [412]  RAG further asserts that it properly established a fiduciary or trust relationship.[413]  It argues that such a relationship existed between Debtor/Defendants and RAG because Debtor/Defendants were customers of RAG and because Debtor/Defendants "ordered its employees to exchange Riverside's information to

---

[410] *In re U.S. Mortg. Corp.*, 491 B.R. 642, 670 (Bankr. D.N.J. 2013) (citation omitted).

[411] *Borough of Kenilworth v. Graceland Mem'l Park Ass'n*, 199 A. 716, 718 (N.J. Ch. Div. 1938).

[412] RAG's Opposition at 91.

[413] *Id.* at 90.

establish a competing company."[414]   RAG, however, does not cite to any authority to support these claims.   With respect to Quad, RAG alleges that "Quad is a successor to Debtor/Defendants and liable for its conduct."[415]

Defendants call this logic "incomprehensible."   The Court agrees and will grant Defendants' motions for summary judgment on Count VI for an accounting.

* * *

As set forth above, there is no genuine issue of material fact and Defendants are entitled to summary judgment on all six counts of the Complaint.

## CONCLUSION

For the foregoing reasons, the Court will deny the Plaintiff's Motion to Amend and will grant the Defendants' Motions for Summary Judgment.   An Order will be issued.

---

[414] *Id.*

[415] *Id.*